UNITED STATES v. COX et al.
UNITED STATES v. BEASLEY et al.
Nos. 4148, 4201.

United States Court of Appeals
Tenth Circuit.
June 21, 1951.

Rehearing Denied July 31, 1951.

Phillips, C. J., dissented.

294

John C. Harrington, Washington, D. C. (A. Devitt Vanech, Washington, D. C., Lorenzo A. Chavez, William B. Robinson, Albuquerque, N. M., and Roger P. Marquis, Washington, D. C., on the brief), for appellant.

LaFel E. Oman and W. C. Whatley, Las Cruces, N. M. (W. B. Darden, Edwin Mechem, Las Cruces, N. M., and W. C. Peticolas, El Paso, Tex., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

These consolidated appeals involve the common question of the correct measure of just compensation for the taking of private lands by the Government for public purposes.

■ All of the lands involved are cattle ranches of the respective appellees in Dona Ana and Otero Counties, New Mexico, appropriated by the United States for war purposes under the Second War Powers Act, § 201, 56 Stat. 177, 50 U.S.C.A. § 171a. The ranches consist of land owned in fee by the ranchers, land leased from the State of New Mexico, and the public domain on which the ranchers hold permits under the Taylor Grazing Act of June 28, 1934, 48 Stat. 1269, as amended, 43 U.S.C.A. §§ 315–315r. The permits grant an exclusive or preferential right to graze a stipulated number of cattle on the public domain, and are usually for a term of ten years with preference for renewal. They are to be recognized and safeguarded, but they create no "right, title, interest, or estate in or to the lands." Section 315b. They have been judicially termed a privilege "withdrawable at any time for any use by the sovereign without the payment of compensation." Osborne v. United States, 9 Cir., 145 F.2d 892, 896; see also Oman v. United States, 10 Cir., 179 F.2d 738.

At the request of the War Department, a proceedings was first instituted on April 3, 1945, to take for military purposes, 556,032 acres in this vicinity for a term of years ending June 3, 1945, extendible for yearly periods during the national emergency. Later, however, it was determined to take the land in fee, and on October 16, 1946, a petition was filed to condemn 427,120.98 acres, including the lands involved here.

The petition to condemn called attention to the fact that a large portion of the lands taken were federally owned, and that the Government did not by this proceedings admit the existence of any rights in such lands in favor of any of the named defendants, or any other persons. Title and possession of the lands were taken on October 21, 1946, and the Government appealed from the Commissioners' appraisement. The four separate proceedings in Number 4148 were consolidated for trial and four separate judgments rendered on jury verdicts. Number 4201 involves one ranch, but the common question of law in all the cases is presented on facts which are not

significantly different, and they will be treated together.

On a pre-trial of the cases, the controversy arose over the correct measure of compensation for the taking of the ranches, the Government contending that since the landowners owned no compensable interest in the permit lands, they could not be taken into consideration in the determination of just compensation for the fee land taken. The ranchers took the position that the ranches necessarily included the fee, leased and permit lands, as an economic unit, and that they should be valued on the basis of the carrying capacity of the ranch as a unit in the determination of just compensation. Pursuant to argument, the trial court ruled that "the jury will be instructed that it will take into consideration the carrying capacity of each respective ranch, irrespective of the type and character of the ownership or the title under which or the right to use which, each such ranch is held, and any other factor which may and is usually used and considered between private individuals in leasing or renting such ranches * *."

Consistently with this ruling, witnesses for the ranchers were permitted to base their evaluation of the ranches upon the carrying capacity times the unit value of the calf crop, plus the value of the improvements. Thus, one of the ranches, with a carrying capacity of 67 head of cattle, was valued at $20,670.00 by multiplying the carrying capacity by a per animal unit value of $152.00, plus the estimated value of the improvements. When one of the witnesses so testifying was asked if he could evaluate the fee land by allocating to it the proportional part of its carrying capacity, plus the improvements, he answered that it could be done, but that ranchers just didn't "trade that way."

In overruling the objections to this method of arriving at fair value of the land taken, the court repeatedly stated in effect that it would instruct the jury that although the landowners could not be compensated for their grazing permits, they could take into consideration the availability and accessibility of these lands in arriving at just compensation for the taking of the fee lands. And, the jury was finally instructed to the effect that the Government was taking only the fee land and that it should determine only the value of such land, but in doing so, it could take into consideration as an element of value, the accessibility and availability of the lands covered by the grazing permits. No exception was taken to these instructions. As a matter of fact, the Government's requested instructions were not at material variance.

■■ Since no exceptions were taken, and since the requested instructions are not inconsistent with those given by the court, no reversible error can be predicted upon them. But even so, the cases were tried and the verdict of the jury in each case is based upon the legal theory that just compensation is to be determined by the value of the ranches as units, based upon their carrying capacity, without regard to the underlying ownership of the land. Such was the established law of the case, and if it is incorrect, the judgments must be reversed, for if the evidence is legally inadmissible to support the verdict of the jury, it cannot stand, although the court's instructions may have been literally correct. The instructions of the court could not change the legal nature and effect of the proof.

■■ Unquestionably, the grazing permits were of value to the ranchers. They were an integral part of the ranching unit—indeed, the fee lands are practically worthless without them. But, "the existence of value alone does not generate interests protected by the Constitution against diminution by the government, however unreasonable its action may be." Reichelderfer v. Quinn, 287 U.S. 315, 319, 53 S.Ct. 177, 178, 77 L.Ed. 331. The Constitution requires only that the sovereign pay just compensation for that which it takes, "not for opportunities which the owners may lose." U. S. ex rel. T. V. A. v. Powelson, 319 U.S. 266, 282, 63 S.Ct. 1047, 1056, 87 L.Ed. 1390. Just compensation for that which is taken does not include consequential losses to the owner. Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644; United States v. Petty Motor Co., 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729; United

States v. Willow River Power Co., 324 U.S. 499, 510, 65 S.Ct. 761, 89 L.Ed. 1101; United States v. Miller, 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336. "Such losses may be compensated by legislative authority, not by force of the Constitution alone." United States v. Willow River Power Co., supra, 324 U.S. at page 510, 65 S.Ct. at page 767, 89 L.Ed. 1101.

Thus, in Osborne v. United States, 9 Cir., 145 F.2d 892, the Government took ranches consisting of fee land, leased land, and land held under permit from the Forest Service. 36 C.F.R. Sec. 331.1 et seq. The ranchers sought compensation for the taking of their grazing privileges, as well as severance damages, and appealed from the refusal of the trial court to so instruct the jury. After sketching the history of grazing rights and privileges in the West, Judge Stephens, for the Ninth Circuit, held that the limited right of grazing granted by the permits gave the ranchers no property interest as against the sovereign; that their only recourse for the cancellation of the permits was under Section 315q, Title 43 U.S.C.A., 56 Stat. 654, providing that whenever use for any war purposes of public domain prevents its use for grazing, persons holding grazing permits or licenses which have been or will be canceled because of such use, shall be paid out of funds appropriated or allocated for such project, such amount as the head of such department or agency so using the lands shall determine to be fair and reasonable for the loss suffered by such persons as the result of the use of such lands for war purposes. And, "such payments shall be deemed payment in full for such losses." And see also United States v. Honolulu Plantation Co., 9 Cir., 182 F.2d 172.

■ The ranchers here seek to distinguish this case from the Osborne case on the grounds that the permits were appropriated or withdrawn before the institution of the condemnation proceedings, so that the United States did not actually take the land covered by the permits, as here. But, in our view, there can be no legally significant difference in the withdrawal of the permits for war purposes by the Secretary of the Interior, as in the Osborne case, and the cancellation of the permits by a declaration of taking in condemnation proceedings. In either case, the Government, by appropriate action, has exercised its unquestionable power to take only that which it owns, and in which the condemnee has no compensable interest. It was noncompensable hardships of this kind which prompted the Congress to amend the Taylor Grazing Act to provide for the administrative determination and payment for losses suffered from the cancellation of the grazing permits for war purposes, i. e. Section 315q, Title 43 U.S.C.A.

■ The formula used by the ranchers' witnesses was undoubtedly one of the accepted methods for arriving at the fair market value of the ranch as an economic unit, and it unquestionably would be a proper criterion between private individuals or between the ranchers and the Government if the ranchers owned or had a compensable interest in that which the Government takes. Although the permits are valuable to the ranchers, they are not an interest protected by the Fifth Amendment against the taking by the Government who granted them with the understanding that they could be withdrawn at any time without the payment of compensation.

■ In the determination of just compensation for the lands taken, it is competent to consider the value of the land for the purposes for which it is actually used or reasonably adaptable. Boom Co. v. Patterson, 8 Otto 403, 98 U.S. 403, 408, 25 L.Ed. 206; Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236; Mitchell v. United States, 267 U.S. 341, 344, 45 S.Ct. 293, 69 L.Ed. 644; McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205; United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390; Chicago, Burlington & Quincy R. R. Co. v. City of Chicago, 166 U.S. 226, 250, 17 S.Ct. 581, 41 L.Ed. 979; 2 Lewis Eminent Domain, 3rd Ed., Sec. 707, p. 1233. Undoubtedly, the condemned land was most suitably and profitably adapted for use to which it was devoted, that is, base land for a cattle ranch in connection with grazing permit land, and the fair value of the land for

that purpose would be competent evidence of just compensation. But, it is not competent unless the permit lands are available and accessible for that purpose, and they cannot be said to be available and accessible here, since the permits were withdrawn or canceled coincidental with the taking.

The permit holders here are not unlike riparian owners on navigable streams who enjoy the preferential privileges incident to the use thereof, but have no compensable property right therein when the use is diminished or destroyed by the Government in the exercise of its powers over navigation. United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; United States v. Willow River Power Co., supra. Or, they may be likened to the owner of property by the side of a road or street which greatly enhances his business, but who suffers no compensable loss when the change of the course or grade level of the road or street operates to destroy the advantage, resulting in a business loss. See United States v. Willow River Power Co., supra, 324 U.S. at page 511, 65 S.Ct. 761, 89 L.Ed. 1101; 1 Lewis Eminent Domain, 3rd Ed., Sections 129–134 and 721. Cf. Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765; Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; United States v. Petty Motor Co., supra.

The judgments are accordingly reversed with directions to proceed in accordance with the views herein expressed.

PHILLIPS, Chief Judge (dissenting).

It seems to me there is no substantial reason for not applying the same rule for determining just compensation in the instant cases that we held to be applicable in United States v. Jaramillo, 10 Cir., 190 F.2d 300.

The hardy pioneers who settled the semi-arid West early learned that ample water for livestock was of paramount importance. Hence, they acquired by homesteading and by purchase, tracts of land where water supply from streams, springs, and wells could be developed that would enable them to carry not only the livestock that could be grazed on their privately-owned lands, but many more livestock that could be grazed on adjacent public domain where grass was abundant, but little water available. By controlling the lands which would supply water they controlled the use of the adjacent public domain. Enduring privations, suffering hardships, and encountering grave dangers, these settlers developed livestock raising enterprises that provided them with homes and a means of livelihood.

They first used the public domain under an implied license.[1] Ultimately, they utilized the public domain under preferential permits issued under the Taylor Grazing Act.[2]

In the instant cases the landowners whose private lands were condemned had developed valuable water and water rights in their privately-owned lands and hold preferential grazing permits on public lands adjacent to their privately-owned lands. In Oman v. United States, 10 Cir., 179 F.2d 738, 742, we said: "As long as the permits were unrevoked, a grantor would have no more right to interfere with their exercise than would any third party. In fact, by the very terms of the Taylor Act, the grantor (defendant) had not merely a duty to refrain from the invasion of plaintiffs' grazing privileges, but an affirmative obligation to adequately safeguard them."

It is true that the Secretary of the Interior is authorized under the Taylor Grazing Act to withdraw lands from grazing districts and to cancel or revoke permits.[3]

1. Buford v. Houtz, 133 U.S. 320, 326, 10 S.Ct. 305, 33 L.Ed. 618.

2. 43 U.S.C.A. § 315b, in part, provides: "Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights, as may be necessary to permit the proper use of lands, water or water rights owned, occupied, or leased by them".

3. Oman v. United States, 10 Cir., 179 F.2d 738.
Cf. Red Canyon Sheep Co. v. Ickes, 69 App.D.C. 27, 98 F.2d 308.

While the allegations of the amended complaints in the instant cases warrant the inference that the public lands adjacent to the privately-owned lands were to be included in the project for which the privately-owned lands were to be taken, at the time of the taking and at the time of the trial below the public lands had not been withdrawn from the grazing district by the Secretary of the Interior and the permits had not been revoked, but were in full force and effect. The declaration of taking did not embrace the permit rights. The United States did not undertake to condemn those rights. Indeed, it expressly affirms the contrary. Until the permit rights are cancelled or revoked the taking is subject to them.

In valuing privately-owned ranch properties which control available water supply in the semi-arid West, buyers and sellers for many years have taken into consideration the availability and accessibility of public lands which can be utilized in connection with the privately-owned lands and water under preferential grazing privileges. Without available water supply to provide drink for livestock grazing on public domain, the public lands are of little value. But, their availability and accessibility for use in connection with private lands which control the water supply substantially increase the value of the privately-owned lands.

Just compensation means the full and perfect equivalent in money of the property taken. The compensation to which the owner is entitled rests on equitable principles.[4] "The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken."[5] Market value is the ordinary criterion. It is what a willing buyer would pay in cash to a willing seller, when neither is acting under compulsion.[6] Market value is to be determined as of the time of the taking.[7]

The value should be fixed by considering the property in its condition and situation at the time it was taken.[8]

A reduction or increase in the value of the property taken which results from governmental action providing for the project cannot be considered.[9]

We are not here concerned with consequential damages that will result from the ultimate cancellation or revocation of the permits. Clearly, no such damages can be recovered. Rather, our question is the fair market value of the privately-owned lands and the valuable water and water rights developed by the landowners thereon in the environment in which such lands and water rights were situated at the time of the taking.

Prudent sellers and buyers of land, in arriving at market value, take into consideration the environment in which the land is located. That environment may enhance, and it may detract from, the value of the land.

4. Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 304, 43 S.Ct. 354, 67 L.Ed. 664.

5. United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336; Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 304, 43 S.Ct. 354, 67 L.Ed. 664.

6. United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336; Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236; Maher v. Commonwealth, 291 Mass. 343, 197 N.E. 78, 81.

7. United States v. Klamath and Moadoc Tribes of Indians, 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219; Danforth v. United States, 308 U.S. 271, 283, 60 S.Ct. 231, 84 L.Ed. 240; Jacobs v. United States, 290 U.S. 13, 17, 54 S.Ct. 26, 78 L.Ed. 142; Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664.

8. Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed. 1063.

9. Playa De Flor Land & Imp. Co. v. United States, D.C. Canal Zone, 70 F. Supp. 281, 357, modified on other grounds, United States v. Playa De Flor Land & Imp. Co., 5 Cir., 160 F.2d 131.

In Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 708, 78 L.Ed. 1236, the court said:

"The judicial ascertainment of the amount that shall be paid to the owner of private property taken for public use through exertion of the sovereign power of eminent domain is always a matter of importance for, as said in Monongahela Navigation Co. v. United States, 148 U.S. 312, 324, 13 S.Ct. 622, 625, 37 L.Ed. 463: 'In any society the fullness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government.' The statement in that opinion (page 326 of 148 U.S., 13 S.Ct. 622, 626, [37 L.Ed. 463]) that 'no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner' aptly expresses the scope of the constitutional safeguard against the uncompensated taking or use of private property for public purposes. Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 399, 14 S.Ct. 1047, 38 L.Ed. 1014.

"* * * * * *

"In respect of each item of property that value [market value] may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. *In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining.* Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 124, 44 S.Ct. 471, 68 L.Ed. 934." (Italics mine.)

The contention of counsel for the United States, and the postulate upon which the majority rests its conclusion, if I correctly understand it, is that since the public lands were to be embraced within the project, they would not in the future be available for use in connection with the privately-owned lands under grazing permits and, hence, they should not be considered in arriving at the value of the privately-owned lands. But, the permits were in full force and effect when the land was taken and that postulate, in my opinion, departs from the rule that value is to be fixed for the property as it stands on the date of the taking. In United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, the court held that in arriving at the value of lands taken for a public project, an increase in value which would result from the construction of the project could not be considered. It seems to me the converse must be true that a decrease in value that would result in the future from the construction of the project should not be considered. My views may be expressed more concretely by an illustration: Let us assume that an individual owns a block of land in a city on which he has constructed his home; that it is situated on a two lane parkway street with the parkway beautifully landscaped; that adjacent to the home there is located a public park and a public school which enhance the value of his block of land; that the municipality owning the public park, street, and the public school decides to demolish the school and to utilize the school grounds, the street, and the public park for the construction of a stadium and for parking space and roadways leading thereto, and that it sought to condemn the privately-owned block of land to be included in the project. Obviously, any enhancement of value that would result from the construction of the project could not be considered in arriving at the value of the individual's privately-owned block of land. Likewise, it seems to me, that the municipality could not urge that in determining the market value of the privately-owned land at the time of the taking, consideration could not be given to the enhancement of value resulting from the public park, parkway street and public school, because it was contemplated that in the future the park, the parkway street and school building would cease to exist and would no longer be available. I emphasize that the question is not consequential damages resulting from the taking away of the park, the parkway street and the school for other public purposes, but the value of the privately-owned

land taken in its environment at the time of the taking.

Of course, compensation may not be awarded for the value of the permits. But, it does seem to me that to the extent public lands adjacent to the privately-owned lands available on the date of the taking for use in connection therewith increased the value of the privately-owned lands and water rights, such increased value was a proper item to be taken into consideration in determining the value of the privately-owned lands. It is an element, which together with the water and water rights developed on the privately-owned lands, any purchaser of the privately-owned lands under the conditions existing on the date of the taking would have taken into consideration. To deny the landowners that element of value will not give them the full and perfect equivalent in money of their property taken on the date of the taking. It will deny the landowners any value whatever for a large portion of the water and water rights they have developed on their privately-owned lands. I cannot believe the law is so inflexible that it cannot accommodate itself to the unusual factual situations here presented and award to these landowners fair and just compensation for their privately-owned lands and the water and water rights developed thereon.

At the trial below, counsel for the United States concurred in the views I have expressed. The Court gave, at their request, the following instruction, in Number 4201: "You are to determine only the value of the privately owned land. In determining the value of the privately owned land you may consider the existence of the permit to graze livestock on the public domain as bearing upon the value of the tracts owned by the condemnee but you are specifically charged you cannot make an allowance for the taking of the public domain itself upon which the land owner had a grazing permit because that is a matter to be determined by the War Department outside of the condemnation proceedings."

And they requested substantially the same instruction in Number 4148.

It is my view that the judgment should be reversed and the cause remanded with instructions to determine the value of the privately-owned lands in accordance with the views I have expressed.