**WHITE SANDS RANCHERS OF NEW MEXICO, on Behalf of Themselves and Others Similarly Situated, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Cong. Ref. No. 2–84.

United States Claims Court.

March 30, 1988.

**560**

Harold L. Hensley, Jr., Roswell, N.M., for plaintiffs. Hinkle, Cox, Eaton, Coffield & Hensley, of counsel.

Gerald S. Fish, Washington, D.C., with whom was F. Henry Habicht, II, Asst. Atty. Gen., for defendant. Peter J. Sacripanti, of counsel.

### OPINION

WIESE, Hearing Officer.

### INTRODUCTION

This is a congressional reference proceeding brought here under the authority of Senate Resolution 405, 98th Cong., 2d Sess. (1984). The resolution directs the court to consider a bill, S. 2761, 98th Cong., 2d Sess. (1984) (titled "A bill for the relief of the White Sands ranchers of New Mexico") in accordance with the procedures of 28 U.S.C. §§ 1492 and 2509 (1982). Specifically, the court is asked to advise the Congress whether the relief contemplated by the bill—compensation to the ranchers (claimants here) "for the loss of real property, grazing privileges, and the value of mineral claims resulting from the actions of the United States in acquiring land for the White Sands Missile Range"—would discharge a legal or equitable claim against the United States and, if so, the amount

thereof; or, instead, would represent a gratuity. Based on the facts of the controversy and the analyses they give rise to, it is concluded that the claimants in this proceeding have neither a legal nor equitable claim against the United States and that any compensation awarded them would amount to a gratuity.

### FACTS [*]

The White Sands Missile Range ("the Range") is a military facility located in the State of New Mexico that is used by the Army, Navy and Air Force and other Government agencies in the research, development and testing of guided missiles and other weapons systems. The Range, which occupies an area roughly 100 miles in length and 40 miles in width, has been under the continuous and virtually exclusive control of the Federal Government since the early 1940's. Prior to 1975—the year in which the Government began condemnation proceedings to acquire permanent title to the private land holdings within the Range—the Range was comprised of approximately 1,459,943 acres of public domain land, 343,817 acres of land owned by the State of New Mexico and 71,905 acres of privately-owned land, all of which were used at an earlier time as a unified grazing range by the individual ranching interests involved in this proceeding or their predecessors in interest.

This congressional reference proceeding focuses on the loss of these lands and with them the private ranch units they supported. The essence of the dispute is the ranchers' contention that they were never adequately compensated for the lands they had historically used for grazing purposes. That contention grows out of a long history of dealings with the United States, the essential details of which are recounted below.

### January 1942: The Initial Dislocation By Government Occupancy

Prior to 1941, plaintiffs and their predecessors in title were the owners of ranch

---

[*] The facts we recite here are drawn from the parties' stipulation of facts and from the historical source materials that accompany the briefs on the law.

units comprised of privately-owned patented lands, state lands held under grazing leases issued by the State of New Mexico, and public domain lands utilized under federal grazing permits issued pursuant to the Taylor Grazing Act, *as amended,* 43 U.S.C. § 315 et seq. (1982), and, in some instances, public domain lands embraced in mining claims. All of these lands are within what is now the White Sands Missile Range.

At the outbreak of World War II, the President, acting pursuant to Executive Order No. 9029, 7 Fed.Reg. 443 (1942), temporarily withdrew all public lands then within the present Range "from all forms of appropriation under the public land laws, including the mining laws" and reserved these lands "for the use of the War Department as a general bombing range." The order recited that the lands so reserved should be "returned to the administration of the Department of the Interior when they are no longer needed for the purpose for which they are reserved."

Along with this withdrawal order, the Government also took action to acquire rights in the remaining non-federal lands lying within the withdrawn area, either by entering into voluntary agreements for use with the respective ranchers or else through formal condemnation proceedings. The first such condemnation action was filed by the United States on January 29, 1942 for the stated purpose of acquiring an easement "of exclusive use and possession for five years" in certain specified lands "for use in connection with the establishment of the Alamogordo, New Mexico, Bombing Range [the original name of the White Sands Missile Range]." The condemnations were carried out pursuant to the authority set forth in Executive Order No. 9029, as amended by Executive Order 9526, 10 Fed.Reg. 2423 (1945), and the Second War Powers Act of March 27, 1942, 56 Stat. 176 (1942).

As compensation for the use of these lands (whether acquired by condemnation or through voluntary lease agreements), the ranchers received annual payments from the Government measured by the grazing capacity of each ranch unit. That is, the value per acre for each ranch unit was determined on the basis of the total acreage involved (including the state and federal lands) and the amount of livestock that acreage could support. This payment scheme—one which specifically took into account grazing values attributable to lands owned by the United States (the Taylor Grazing Act lands)—was carried out under the authority of a 1942 amendment to the Taylor Grazing Act (Act of July 9, 1942, 56 Stat. 654 (1942)), now codified as 43 U.S.C. § 315q (1982). (The statute is examined in more detail at a later point in this opinion.)

### 1945–1949: A Period of Co–Use

Initially it had been anticipated that the Government would remain in possession of the ranch units only for the duration of the war. However, because of changing world circumstances, the military's need for the Range lands continued beyond the termination of actual hostilities. Thus, beginning in 1945, the Government undertook efforts to renew its lease rights in the lands, for a term ending June 30, 1947, and extendable for a yearly period thereafter at the option of the Government.

The agreements and condemnations initiated at this time did not, however, give the Government exclusive use of the Range lands. Rather, the arrangements were structured on a co-use basis, meaning that the ranchers were allowed to resume ranching operations but were required to vacate the lands when test firings took place. Though this shared-use concept was less-than-ideal, some ranchers did return to their ranches to resume operations. In many instances, this resumption demanded an extensive restoration effort because improvements on the lands had either been destroyed or substantially damaged by the Government's wartime use.

### 1950–1970: The Government Resumes Exclusive Occupancy Through Lease and Suspension Agreements

The co-use arrangements did not prove workable. By 1949—scarcely four years later—missile firings at White Sands had

become a common occurrence, so much so that, for the sake of efficiency and safety of operations, exclusive possession of the lands became a necessity. Therefore, in 1949, the Government began negotiations to acquire long-term leases on the ranch units within the Range. Throughout these negotiations the Government took the position that if voluntary agreements could not be negotiated, condemnation actions to acquire long-term leases would immediately be filed.

For the most part, existing lease agreements were renewed and new agreements called "Lease and Suspension Agreements" [1] were entered into beginning July 1, 1950 for a one-year term, extendable at the Government's option on a year-to-year basis but not beyond June 30, 1970. Among other things, these agreements provided that the transaction should be "without prejudice to the position of the Grantor in any application for grazing privileges made when and to the extent that the ... described lands are returned to federal grazing administration." As to the rentals paid by the Government under the agreements, the compensation scheme remained the same as before: payment determined according to each ranch unit's grazing capacity. Payments for the federal lands included in each ranch unit were made pursuant to 43 U.S.C. § 315q.

### 1952: Public Land Order No. 833—Withdrawal of the Public Lands

On May 21, 1952, following execution of the lease and suspension agreements, the Secretary of the Interior issued Public Land Order No. 833, 17 Fed.Reg. 4822 (1952), withdrawing approximately 2,394,-384 acres of public lands in New Mexico "from all forms of appropriation under the public-land laws, including the mining and mineral-leasing laws, and reserved for the use of the Department of the Army for military purposes." This order superseded and revoked Executive Order No. 9029 of January 20, 1942. The order also included

a declaration of intent that "when the lands described ... are no longer needed for the purpose for which they are reserved they shall be returned to the administration of the Department of the Interior, the Department of Agriculture, and any other Federal agency according to their respective interests of record."

### 1970: The Turning Point in Government–Rancher Relations

The Government remained in possession of the Range lands through annual renewals of the lease and suspension agreements extending through June 30, 1970—the expiration date of the twenty year term. But, as had been the case twice before, the ranchers' expectations of returning to their lands were not to be realized.

On April 6, 1970, at a public meeting convened by the Government, the ranchers were advised for the first time that the Government would continue to occupy the ranch units after June 30, 1970 on a year-to-year lease basis for a period not to exceed ten years. Possession of the lands—they were told—would be secured either through voluntary agreements or by condemnation actions.

At this time, the ranchers were also informed that the compensation to be paid them for the continued use of the lands would be reduced significantly from the amounts previously paid. This planned reduction in future lease payments grew out of the Government's view that the public domain lands should no longer be included in the compensation formula. That is, the Government now took the position that the payments which the ranchers had received under the lease and suspension agreements subsumed full compensation to them for their Taylor Grazing Act lands. At the same time, Government personnel indicated that compensation for restoration of improvements (as required by the lease and

---

1. The term "lease and suspension" describes the nature of the transaction between the ranchers and the Government, i.e., the Government was agreeing to lease the non-federal lands and, simultaneously, to suspend use of the Taylor Grazing Act permits.

suspension agreements) would be negotiated and paid.

The ranchers strongly disapproved of the Government's decision to remain in possession of the ranch units and they refused to voluntarily relinquish possession of the lands. The Government was therefore forced to pursue its goal through condemnation proceedings. Accordingly, the Government condemned leasehold interests in the state and privately-owned lands within the Range for the period from July 1, 1970 through June 30, 1971, renewable annually through June 30, 1980 at the Government's option.

### 1975: The Government Begins the Acquisition of Fee Interests Through Condemnation Proceedings

Starting about 1975, the Government, acting pursuant to authorization granted by the Military Construction and Reserve Forces Facilities Authorization Act of 1974, 87 Stat. 661 (1973), and the Military Construction Appropriations Act of 1974, 87 Stat. 766 (1973) and 1980, 93 Stat. 928 (1979), began to condemn in fee all of the privately-owned land within the ranch units —a process since completed. The compensation awarded the ranchers for the taking of their lands—that is, for the initial acquisition of leasehold interests and the later acquisition of the fee interests—was determined by the court according to a valuation formula that specifically excluded any enhancement in value attributable to the public domain lands. In other words, the private lands were valued as if the contiguous public domain lands did not exist.

### 1975: The Ranchers Resort to Litigation

Dismayed by the Government's failure to relinquish possession of the Range lands upon expiration of the lease and suspension agreements in 1970 and by its simultaneous decision to exclude the value of the Taylor Grazing Act lands from any future payments to them, some of the ranchers represented in this action brought suit in 1975 in the United States Court of Claims (this court's statutory predecessor) seeking damages for each of these asserted injuries. *Diz Livestock Co. v. United States*, 210 Ct.Cl. 708, 538 F.2d 348 *cert. denied*, 429 U.S. 1023, 97 S.Ct. 640, 50 L.Ed.2d 624 (1976).

The suit was not successful. As to the first point, the court held that the Government's failure to return the property amounted to no more than a "technical breach" (the court's words) because "[a]t the instant it was obligated to restore plaintiffs, defendant properly condemned an additional ten-year interest in plaintiffs' lands." *Id.* at 711, 538 F.2d 348. With regard to the second argument, the court said in substance that plaintiffs had failed to show any arbitrariness in the Government's position deeming their interests in the federal grazing lands to have been paid for in full through past rental payments. *Id.* at 711–12, 538 F.2d 348.

Three years later, 1979, another suit was brought in the United States Court of Claims—this time by the State of New Mexico joined by substantially all of the ranching interests involved in the instant proceeding. In this suit, initially titled *Armijo v. United States*, 229 Ct.Cl. 34, 663 F.2d 90 (1981), the plaintiffs sought a determination that the Government, by its acquisition in fee of the private lands within the ranching units, had also inversely condemned all of the state lands and the state grazing leases incident thereto by depriving the state and its grazing lessees of any further use of the lands.

The plaintiffs' contention was upheld. The court rejected the Government's argument that it was constitutionally permissible to condemn no more than a leasehold interest in the state lands while simultaneously acquiring the entire possessory interest in the adjacent private lands. In the court's assessment of the situation, the fact that there was no foreseeable end to the Government's need for the Range (this as stipulated by the parties and as further evidenced by the permanent acquisition of the private lands), made it clear that the leasehold condemnations of the state lands were simply a dodge to the Government's real intentions: to retain the use of the

state lands on as permanent a basis as the private lands. Said the court: "Defendant cannot ... state a taking that is permanent for all purposes except assessment of just compensation, and temporary as to that alone. That is the effect of what it does here." *Id.* at 38–39, 663 F.2d at 94.

The court therefore concluded that the United States had taken "the entire fee of the state lands and must pay unless it can show it took before March 12, 1973 [in which case the claim would be time-barred]." *Id.* at 39, 663 F.2d at 95. The matter was remanded to the trial court for further proceedings to ascertain the date of taking.

On August 15, 1985, the Claims Court, in the same action (by then denominated *Baca v. United States*), entered an order determining that the taking of the fee interest in the state lands had occurred on July 1, 1976 (*Baca v. United States*, No. 94–79L, Order Granting Partial Summary Judgment (unpublished)). Subsequently, on May 20, 1987, the parties to the action (now denominated as *Humphries v. United States*) filed a stipulation in partial settlement of the claims of the State of New Mexico (*i.e.*, the claims based on the surface estate) and in full settlement of the claims of the plaintiff grazing-land lessees.[2]

*A Parallel Situation: The Government's Occupancy and Acquisition of the McGregor Range*

In 1949, about the same time the Government was beginning to acquire long-term leases on the lands comprising the White Sands Missile Range, it also began to arrange for the long-term use and occupancy of some 697,472 acres of neighboring land located in Otero County, New Mexico—an area known as the McGregor Range. These lands, like those of the White Sands Missile Range, were devoted to ranching interests whose economic viability depended upon the combined use of privately-owned lands, state-owned lands subject to grazing leases and federally-owned lands subject to grazing permits.

Initially, the Government's use and occupancy of the McGregor Range was accomplished through voluntary leases, leasehold condemnations, and long-term lease and suspension agreements. Then, in 1956, the United States purchased the fee title to the non-federal lands within the McGregor Range. The compensation for these purchases was based on the total grazing capacity of the ranch units, *i.e.*, the livestock that was supportable through the combined use of the private, state and federal lands.

## DISCUSSION

### A.

The basic assertion of the White Sands ranchers is that they were denied their constitutional rights to just compensation when the lands which the Government took from them were valued as individual tracts rather than as parts of integrated ranch units. Considered in the context of a congressional reference proceeding, the inquiry becomes whether the ranchers' claimed entitlement to additional compensation states either a legal or equitable claim against the United States, as opposed to an application for relief that would amount to no more than a gratuity.[3] The analysis that follows pursues these questions.

---

2. For the sake of a full explanation, we point out that despite the ranchers' loss of use of their lands on account of the Government's occupancy, the Commissioner of the Public Lands for the State of New Mexico had continued to renew and issue grazing leases to the individual ranchers on the state-owned lands until July 12, 1982. However, on that date, the ranchers were informed by Alex J. Armijo, then Commissioner of Public Lands for the State of New Mexico, that the state's grazing leases would no longer be renewed. This action by the state followed as a matter of legal necessity from the 1981 ruling by the Court of Claims in *Armijo v. Unit-* *ed States*, 229 Ct.Cl. 34, 663 F.2d 90 (1981), declaring the state lands to have been taken by inverse condemnation. Put another way, the extinguishment of the state's legal title to the lands was correctly understood as extinguishing its power to lease those lands.

3. The relevant statute, 28 U.S.C. § 2509(c) (1982), directs the hearing officer to whom a congressional reference case has been assigned "to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

We start with definitions. The term "legal claim" as used in congressional reference proceedings carries no special meaning; rather, it refers to a demand that is based upon a substantive right, the invasion of which is redressable at law. *California Canners & Growers Ass'n v. United States*, 7 Cl.Ct. 69, 97 (1984). The term "equitable claim," by contrast, does take on a special meaning in the framework of congressional reference actions.

Although the reported decisions do not reflect a uniform definition of the term, generally speaking, an equitable claim involves an injury occasioned by Government fault for which there is either no enforceable legal remedy—due, for example, to the bar of sovereign immunity or the running of the statute of limitations, *California Canners* at 97–100—or the legal remedy that does exist is inadequate to accord the full measure of relief claimed due. *Georgia Kaolin Co. v. United States*, 145 Ct.Cl. 39, 43–45 (1959). In these situations, it is not the sanction of positive law that directs the outcome but considerations of moral responsibility—"what the Government ought to do as a matter of good conscience." *B Amusement Co. v. United States*, 148 Ct.Cl. 337, 342, 180 F.Supp. 386, 390 (1960). The critical determinant—that without which an equitable claim does not exist—is the notion of Government fault: "defendant's liability must rest on some unjustified act or omission to act which caused plaintiffs' damage; otherwise any award would be a pure gratuity." *Id.* at 342, 180 F.Supp. at 390; *Shane v. United States*, 3 Cl.Ct. 294, 304 (1983).

Finally, as to the term "gratuity", in a congressional reference proceeding this signifies a payment or an award to a claimant for which no legal or equitable entitlement has been established; in essence, a gift. With these definitions in mind, we proceed to the case at hand.

### B.

Addressing first the question whether the present claimants have an actionable legal claim against the United States, the answer is "no." For most of the claimants joined in this proceeding, the immediate obstacle is the bar of the statute of limitations; for the remainder, the barrier to relief lies closer to the merits. But the stumbling block in each case lies in the preclusive results of prior litigation.

Dealing first with the limitations issue, the statute, 28 U.S.C. § 2501 (1982), directs that "[e]very claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Many of the claims now before the court fail to satisfy this requirement.

To explain: As previously pointed out, the litigation commenced by the State of New Mexico in the Court of Claims in 1979 (the *Armijo* suit) established July 1, 1976 as the date of taking by inverse condemnation of the state's leased grazing lands. The significance of this date for present purposes lies in the fact that in *Armijo*, the Court of Claims had essentially ruled that the inverse condemnation of the state-owned lands was the constructive counterpart to the direct condemnation of the privately-owned lands. In other words, the court's premise was that because of the economic interdependence of the lands, a permanent acquisition of one interest necessarily implied the permanent acquisition of the other. And given this ruling, it follows that the July 1st taking date found controlling for the state's inverse condemnation action is also controlling for purposes of establishing the taking date of the private lands.

Now to the point: most of the ranchers involved in the present action were also parties to the *Armijo* litigation, and for those interests then the July 1, 1976 date marks the accrual point of their cause of action seeking additional compensation for the taking of their fee lands. Since their claim for legal relief was not brought here until February 11, 1985, they have failed to meet the court's six-year limitations period and the court therefore lacks jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (1982). Accordingly, for all of the claimants now asserting entitlement to legal re-

lief in this proceeding who were also before the court in *Armijo*, there exists no cause of action at law.

■ As to the balance of the present claimants, meaning those whose interests were not included in the *Armijo* litigation, they too face a barrier to the successful assertion of a legal claim that derives from the results of prior litigation, namely the *Diz Livestock* suit.

As previously explained, in that suit the Court of Claims had upheld, as a lawful exercise of administrative discretion, the same compensation scheme adopted by the Government for the acquisition of the fee lands which the claimants are challenging here. Under the rules of *res judicata*, the decision in *Diz Livestock* is binding on any and all of the present litigants whose interests were also before the court in that case. *Restatement (Second) of Judgments* § 27 (1982).

Finally, as to those claimants who were not part of the *Diz Livestock* litigation, they too encounter essentially the same fate, for the doctrine of *stare decisis* obliges this court to accept as precedent all published decisions of the former United States Court of Claims unless and until modified by decision of the United States Court of Appeals for the Federal Circuit or the United States Supreme Court. *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed.Cir.1982). Accordingly, for the various reasons stated, the claimants in this proceeding have no legal claim against the United States for additional compensation for the taking of their fee lands.

### C.

As we have noted, though a claim may be barred at law, in a congressional reference proceeding the matter can survive as an equitable claim and thus be considered on its merits. For such cases, the congressional reference statute, 28 U.S.C. § 2509(c) (1982), directs the hearing officer to whom the case has been assigned to advise the Congress of "facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy." These, then, are the concerns we take up first in the consideration of the claimants' application for equitable relief.

■ The ranchers do not offer much of an explanation as to why their pursuit of relief at law was so long postponed. The answer suggested by their brief is that they saw themselves without an effective legal remedy—at least until the favorable outcome of the inverse condemnation action commenced by the State of New Mexico in 1979. That suit, the decision in which was not announced until October 21, 1981, apparently kindled new hope that relief might still be available to them and that, in turn, gave impetus to their efforts to obtain a congressional reference proceeding.

What matters now, however, is not whether the ranchers' delay in commencing suit is legally excusable (it surely would not be since the inactivity was a matter of their own choosing); rather, the important concern is whether the Government's litigating position has been prejudiced on account of the delay. The question, in other words, is whether the equitable doctrine of laches should be asserted against them. The answer is "no." The Government raises no contention that proof has been lost through the passage of time; indeed the completeness of the record points the other way. Accordingly, we go on to consider the claim before us.

It is settled law that grazing permits, though they are of much value to ranchers in the operation of an integrated ranching unit, nevertheless do not constitute property for purposes of the just compensation clause. *United States v. Cox*, 190 F.2d 293 (10th Cir.), *cert. denied*, 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652 (1951). The permits create no interest or estate in public lands, only a privilege which may be withdrawn and thus "[n]o property rights accrue to the licensee upon revocation which are compensable in condemnation." *Acton v. United States*, 401 F.2d 896 (9th Cir.1968), *cert. denied*, 395 U.S. 945, 89 S.Ct. 2018, 23 L.Ed.2d 463 (1969). It has also been held

that even as the grazing permits may not be assigned any compensable value in their own right, so neither may the market value which they contribute to private fee lands be recognized in the just compensation due upon the taking of the private lands. *United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). The reasoning is that the grazing permits or, more specifically, the federal domain lands to which they pertain, represent values which the Government itself owns outright and for which, in fairness, it ought not to have to pay. *Id.* at 492–93, 93 S.Ct. at 804.

These rules of law the ranchers do not question. The argument is raised, however, that the rules do not apply to this case for Congress, they say, has statutorily prescribed that compensation be paid them for values not traditionally compensable as part of the "just compensation" formula. Specifically, the ranchers refer to section 315q of Title 43, which reads in full as follows:

> Whenever use for war or national defense purposes of the public domain or other property owned by or under the control of the United States prevents its use for grazing, persons holding grazing permits or licenses and persons whose grazing permits or licenses have been or will be canceled because of such use shall be paid out of the funds appropriated or allocated for such project such amounts as the head of the department or agency so using the lands shall determine to be fair and reasonable for the losses suffered by such persons as a result of the use of such lands for war or national defense purposes. Such payments shall be deemed payment in full for such losses. Nothing contained in this section shall be construed to create any liability not now existing against the United States.

The statute, section 315q, was a wartime measure first introduced as an amendment to the Taylor Grazing Act in 1942 and thereafter amended in 1948. It was intended as remedial legislation aimed at lessening the losses suffered by ranchers from dislocations caused by the Government's use and occupancy of their lands. To the

ranchers, the statute signifies Congress' intention that the loss of the use of the public domain not go uncompensated. As they see it, compensation for the loss of the lands should have been determined according to a ranch-unit basis of valuation. Since the Army did not adhere to such a payment scheme—the private lands were valued only as isolated rural tracts—the ranchers contend that they were unlawfully denied their statutory rights.

The argument is only partially correct. Certainly it is true that Congress intended the statute to redress some of the injuries suffered by the ranchers at the Government's hands. That much is clear from the text. But it is not correct to conclude that the statute mandates payments measured on a ranch-unit basis. On the contrary, the statute specifies no fixed standard of compensation other than "such amounts as the head of the department or agency ... shall determine to be fair and reasonable"; and it underscores the administrative discretion implicit in this standard by cautioning that "[n]othing contained in this section shall be construed to create any liability not now existing against the United States."

Lest there be any doubt that discretion was indeed intended, one need only look to the words of Congressman Robinson of Utah, one of the original sponsors of the legislation, who explained: "This bill gives you the right only to receive such sum as the Army wants to pay you." 88 Cong. Rec. 5652 (1942). The statute, then, is not a full and perfect supplement to the constitutional requirement of just compensation. Rather, it is an authorization for discretionary payment and the courts have so held. *Diz Livestock Co. v. United States*, 210 Ct.Cl. 708, 711, 538 F.2d 348 (1976); *Osborne v. United States*, 145 F.2d 892 (9th Cir.1944).

Of course, to say that a statute reposes discretion in those charged with its administration does not mean that the exercise of that discretion is immune from a court's power to review. To the contrary, so long as Congress has not specifically decreed nonreviewability, and here it has not, judi-

cial scrutiny is appropriate. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). The standard of review is whether the action under challenge has a rational basis, *i.e.*, is not so clearly wrong as to be arbitrary. *Citizens To Preserve Overton Park, v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). This then brings us to the next of the ranchers' contentions.

■ The ranchers contend that the administration of the statute was flawed because the Government did not implement it in an even-handed fashion. Specifically, they refer to the fact that when the Government acquired the McGregor Range lands in 1956, it paid for those lands on a ranch-unit basis and, so far as the court can tell from the record, without offset for the amount of rental payments that had been made during the seven-year leasing period preceding the fee acquisitions. However, in regard to the lands at issue, the Government did not begin to acquire the fee interests until the mid–1970's— more than thirty years after the initial occupancy—and then it took the position that a ranch-unit basis of compensation was inappropriate on the theory that the value of the public domain lands had been paid for through the preceding years' leasehold payments. As the ranchers see it, this difference in treatment has no logical justification and, hence, amounts to nothing more than arbitrary action.

To elaborate upon the point, they offer two specific arguments. First, the ranchers contend that the amounts received under the lease and suspension agreements were payments for the Government's *current* use and occupancy of their lands, including the federal grazing lands. Thus, this contention continues, the Government could not at a later date look to those same payments in satisfaction of the compensation due the ranchers for the extinguishment of their *future* rights in the federal grazing lands. The premise is that since these interests—the right to present possession and the right to future possession—are recognized as distinct interests in

property law, they are, therefore, separately compensable here. Their brief puts it this way: "[T]he White Sands Ranchers are entitled to compensation based on a valuation of each ranch unit, inclusive of all federal public domain lands, without regard to the rentals paid them under the Lease and Suspension Agreements."

The problem with this argument is that the ranchers held no enforceable property rights in the public domain to start with; hence, it is meaningless to distinguish between present and future possessory interests—between payments made for leasehold occupancies and payments to acquire fee interests. The hard truth of the matter is that, apart from section 315q, the ranchers have no "rights" to compensation for their loss of use of the public domain.

■ This then brings us to the second argument. The ranchers say that even if they do not have a right to compensation under § 315q, they do have a right to even-handed administration of the statute, meaning that they should have been treated no less favorably than the McGregor ranchers.

In taking up this second argument, we start with the proposition that equality of treatment is indeed so basic to our understanding of justice "that discretion, where it is allowed a role, must pay the strictest heed." *International Business Machines Corp. v. United States*, 170 Ct.Cl. 357, 367, 343 F.2d 914, 920 (1965), *cert. denied*, 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966). This does not mean, however, that in exercising the administrative powers granted under section 315q, the Government is bound to an absolute identity of treatment of all beneficiaries coming within the purview of the statute. If that were so then the discretion granted by the statute would be meaningless. Rather, what is demanded is that the administrative powers be exercised reasonably, with due regard to the objectives of the statute, the practice under it and the circumstances of the case at hand. The "concern [is] to avoid an application [of the law] that will 'result in the denial of substantial justice'." *Gulf Oil Corp. v. Hickel*, 435 F.2d 440, 445 (D.C.Cir.1970) (quoting *NLRB v. J.S. Pop-*

*per, Inc.,* 113 F.2d 602, 603–604 (3d Cir. 1940)). Fairness in each situation is the equality of treatment that the law demands. Thus, the issue comes down to this: giving due allowance to the differences in their circumstances, were the White Sands ranchers treated essentially the same as the McGregor ranchers? The answer is "yes."

By way of explanation, we start with some numbers. First the McGregor Range. The record shows that the 1956 acquisition cost of the McGregor Range was approximately $3.4 million dollars or roughly $4.74 per acre. This figure, as we have noted, presumably does not include the additional amounts which the ranchers received as lease payments during the Government's seven years of temporary occupancy prior to acquisition. Nor does the record specify the dollar amount of these leasehold payments. Thus, for lack of anything better to go on, the court will assume that the leasehold payments would have added another dollar to the total per-acre costs of the Government for its occupancy and acquisition of the McGregor Range; hence, a total per-acre cost of $5.74. The White Sands ranchers, by comparison, received total payments from all sources—leasehold payments, restoration payments, condemnation awards and sums in settlement of their interests in the *Armijo* litigation—amounting to approximately $27.5 million or roughly $14.50 per acre.

The significance of these numbers is that they are roughly comparable when adjusted on the basis of the intervening cost of money. That is, during the period 1956 through 1980, the maximum interest rate payable on time and savings deposits held less than one year averaged approximately 4 percent (3.94 is the precise figure).[4] Applying this annual interest rate to a principal amount of $5.74 (the McGregor Range per-acre cost) yields a value in 1980 of $15.33 per acre. In terms of per-acre expenditures, this means that the Government spent about the same relative amount for its use and acquisition of the two

ranges. Stated in 1980 dollars, the amounts were $15.33 for the McGregor Range and $14.50 for the White Sands Missile Range. Given these numbers, there is no case here for saying that section 315q was applied in an arbitrary manner.

The ranchers dispute this conclusion. They insist that comparability in total dollar compensation does not tell the whole story. What is overlooked, they say, are the advantages that accrued to the McGregor ranchers by receiving payment for their lands in a lump sum amount measured against land values contemporaneous to the time of acquisition. Payment on this basis made it possible for the McGregor ranchers to acquire replacement lands and thus to continue to earn income from ranching activities.

The White Sands ranchers, by contrast, were paid for their lands more or less incrementally—in part through the accumulated value of rental payments and in part through condemnation awards for their fee lands and state grazing lands—and, most significantly, the final sum of these payments did not match the cost of acquiring replacement lands. It is pointed out that by 1980, when the last of the condemnations was taking place, the per-acre value of grazing lands in the State of New Mexico was approaching an all-time high with the value of the White Sands Missile Range lands then being worth roughly twice the amount which the Government had paid for them.

In addition to being denied compensation sufficient to acquire replacement lands, the ranchers stress that, along with the loss of the lands, they also lost the income those lands yielded. They maintain that if they had been able to continue in the ranching business (through the purchase of replacement properties) they would have received in income more than double the amount which the Government was paying them for the rental of their lands. Based on these two grounds, the ranchers argue that

4. This figure is derived from a report titled "Methods and Compensation for Ranch Properties and Grazing Permits on the White Sands Missile Range" which is included as an exhibit in the record.

even if the compensation they received from the Government was roughly comparable to that paid to the McGregor ranchers, differences in the timing of that compensation produced significantly different economic consequences for the two groups of ranchers.

In considering these arguments, we must keep in mind that the Government, in enacting section 315q, was not committing itself to any fixed standard of compensation but only to the payment of "such amounts as the head of the department ... shall determine to be fair and reasonable for the losses suffered." Pursuant to the statute, the Government paid the White Sands ranchers millions of dollars *for lands they did not own.* Viewed from this perspective, an argument that cries "foul" because others came out better carries a heavy burden. The arguments cannot succeed because they are not enough to persuade that the White Sands ranchers were denied substantial justice in the Government's administration of section 315q.

The ranchers' final argument involves a number of separate contentions, all of which they see as contributing to a frustration of their rights to due process of law, and, ultimately to a denial of just compensation. In this catalog of wrongs the ranchers include the following: (i) an institutional failing on the Government's part that resulted in the piecemeal taking of their lands; (ii) a reneging of contract commitments made by the Government that had assured them of the restoration of their ranches on a ranch-unit basis, including the public domain lands; and (iii) a demonstrated lack of fair and honorable dealings by the Government when it said for the first time in 1970 that the rental payments were also intended to constitute complete compensation for the ranchers' loss of their Taylor Grazing Act permits.

None of these criticisms should be lightly turned aside for, if nothing else, they voice the frustrations borne of a lifetime of dealing with the Federal Government. Yet, in the final analysis, it must be said that they do not advance the claimants' case for these asserted shortcomings in the exercise of the Government's power of eminent domain do not constitute any actionable wrongs in their own right. Only those assertions are relevant here that bear on the question whether, under the laws of the United States, the White Sands ranchers suffered an invasion of rights for which additional compensation is due them. The inquiry made in this case has revealed no such invasion.

### CONCLUSION

Based on the reasons stated, it is concluded that the claimants do not have a legal or equitable claim against the United States and that any payment to them would be a gratuity.