KERR–McGEE CORPORATION; Kerr–McGee Chemical Corporation; and Global Exploration and Development Corporation, Plaintiffs,

v.

The UNITED STATES, Defendant.

Cong. Ref. No. 92–718 X.

United States Court of Federal Claims.

Sept. 12, 1994.

Peter J. Nickles, Steven J. Rosenbaum, and Eric Dodson Greenberg, Covington & Burling, Washington, DC, counsel for Kerr–McGee Corp. and Kerr–McGee Chemical Corp., Elmo Hoffman, Brownlee, Hoffman & Jacobs, P.C., Orlando, FL, counsel for Global Development Corp.

Gerald S. Fish, Dept. of Justice, Washington, DC, atty. of record, for defendant.

## HEARING OFFICER'S REPORT

WIESE, Hearing Officer:

### Introduction

The plaintiffs in this congressional reference case come before us after a protracted journey. Thirty years ago, Kerr–McGee Corporation and Kerr–McGee Chemical Corporation (collectively referred to as "Kerr–McGee") and Global Exploration and Development Corporation ("Global") first filed applications for phosphate prospecting permits on acquired lands in the Osceola National Forest in Florida. Following plaintiffs' discovery of phosphate deposits on those lands in the late 1960s, the question of whether plaintiffs were entitled to mine the deposits has been raised in countless fora. This question has been the subject of numerous lawsuits by plaintiffs, environmental groups, and officials of the State of Florida; it has been

the focus of intense political pressure on both the executive and legislative branches; in Congress, it has prompted bills, hearings, a Wilderness Act, and ultimately this congressional reference itself.

### Legal Framework

To fully appreciate the facts of this case as they unfold, it is necessary to begin with some basic understanding of the laws and regulations governing the issuance of mineral leases on government lands. The Mineral Leasing Act of 1920, as amended, 30 U.S.C. §§ 181–263 (1988 & Supp. IV 1992), sets forth the statutory scheme for phosphate leasing:

> Where prospecting or exploratory work is necessary to determine the existence or workability of phosphate deposits in any unclaimed, undeveloped area, the Secretary of the Interior is authorized to issue, to any applicant qualified under this chapter, a prospecting permit which shall give the exclusive right to prospect for phosphate deposits ...; and if prior to the expiration of the permit the permittee shows to the Secretary that *valuable deposits* of phosphate have been discovered within the area covered by his permit, the permittee shall be entitled to a lease for any or all of the land embraced in the prospecting permit.

30 U.S.C. § 211(b) (emphasis added).

The Mineral Leasing Act applies on its face only to lands in the public domain, that is, lands that have been continuously in federal ownership. However, its provisions are also applicable to acquired lands—those purchased by the United States. Acquired lands are subject to the Mineral Leasing Act for Acquired Lands, as amended, 30 U.S.C. §§ 351–360 (1988 & Supp. IV 1992), which states that such lands are to be leased by the Secretary of Interior "under the same conditions" as specified in the Mineral Leasing Act for public domain lands. 30 U.S.C. § 352.

Under the Mineral Leasing Act, a permittee is entitled to a lease if it has found a "valuable deposit" of phosphate. The standard was elucidated in a May 7, 1976 regulation issued by the Department of Interior:

> A permittee has discovered ... a valuable deposit ... if the mineral deposit discovered under the permit is of such a character and quantity that a prudent person would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine. The permittee must present sufficient evidence to show that there is a reasonable expectation that his revenues from the sale of the mineral will exceed his costs of developing the mine, and extracting, removing, and marketing the mineral.

41 Fed.Reg. 18,845, 18,847. The regulation states further that "[t]he standard ... shall apply to all future applications for leases by prospecting permittees, and to applications pending on the effective date of this regulation [May 7, 1976]." 43 C.F.R. § 3520.1–1 (1976).

It is important to note that the authority to issue a mineral lease is not vested solely in the Department of Interior. The Mineral Leasing Act for Acquired Lands provides that no lease may issue "except with the consent of the head of the executive department ... having jurisdiction over the lands ... and subject to such conditions as that official may prescribe to insure the adequate utilization of the lands for the primary purposes for which they have been acquired or are being administered." 30 U.S.C. § 352. Thus, lands that fall outside of Interior's exclusive jurisdiction cannot be leased without the other agency's consent.

### Facts

#### Permits and Lease Applications

In 1964 and 1965, plaintiffs filed applications for phosphate prospecting permits on acquired lands in the Osceola National Forest. On the basis of these applications, the Department of Interior decided that it would be appropriate to issue prospecting permits to both Kerr–McGee and Global. The Forest Service—an agency within the Department of Agriculture—concurred in the decision, on the condition that use stipulations could be imposed at a later date if plaintiffs were to apply for leases. Accordingly, each prospecting permit contained the following lan-

guage: "In the event the permittee makes application for mining lease on any lands under this permit, the Forest Service reserves the right to include in such mining lease special stipulations to protect surface values."

Following issuance of the permits, Kerr–McGee and Global pressed forward with their prospecting work. Both located phosphate deposits on the lands in question. As a consequence, between 1969 and 1972 each filed applications for phosphate leases, asserting that they had discovered "valuable deposits" of the mineral.

*Showings and Stipulations*

Having reached the lease application stage, Kerr–McGee and Global were instructed to submit mining and reclamation plans for the lands they wished to lease. The content of these plans was affected by the 1976 regulation defining "valuable deposit." This regulation required each lease applicant to "present sufficient evidence to show that there is a reasonable expectation that his revenues from the sale of the mineral will exceed his costs of developing the mine, and extracting, removing, and marketing the mineral." 43 C.F.R. § 3520.1–1.

In the course of fulfilling this requirement, plaintiffs were told to submit their mining and reclamation plans in two increments: the "initial showing" and the "final showing." In the initial showing, plaintiffs had to demonstrate the extent of minerals discovered. In the final showing, they were obliged to show the economic viability of a mining operation, taking into account costs of compliance with environmental regulations and lease terms.

Kerr–McGee submitted its "initial showing" on August 11, 1978. This plan stated that Kerr–McGee would be using a sand/clay reclamation technique that had been developed at Brewster Phosphates, a company in

which Kerr–McGee is a partner. The Bureau of Land Management (BLM) accepted Kerr–McGee's initial showing on May 19, 1981;[1] as a result, on June 10, 1981, BLM asked the Forest Service to prepare the final stipulations for Kerr–McGee's requested leases.

Meanwhile, on August 14, 1978, Global presented its own "initial showing." BLM accepted Global's initial showing on September 18, 1981;[2] on October 7, 1981, BLM asked the Forest Service to prepare final stipulations for Global's requested leases.

On February 3, 1982, the Forest Service gave BLM the requested stipulations. The stipulations included the following requirements for reclamation:

1. The lessee shall restore the capability of the lease areas to fulfill the primary purposes for which the lands were acquired or are being administered. Those primary purposes are regulation of the flow of navigable streams and the production of timber, and, for example, recreation and wildlife.

. . . . .

. . . . .

4. The lessee shall, except for permanent lakes created by mining, reestablish watercourses, soil stability and productivity, approximate landforms and elevations, and wetland and upland of similar vegetative communities and species diversity in approximate proportions as those existing prior to mining.

On March 25, 1982, Kerr–McGee submitted its "final showing" to BLM.[3] Global submitted its "final showing" on June 25, 1982.[4]

---

1. BLM had previously advised Kerr–McGee that its initial showing did not comply with the regulations. Kerr–McGee supplemented its showing on October 16, November 17, and December 3, 1980, thus apparently curing the deficiencies.

2. As with Kerr–McGee, BLM had previously told Global that its showing was inadequate. Global supplemented its showing on January 29 and July 17, 1981.

3. This showing was supplemented on April 23, 1982.

4. The Department of Interior requested supplemental data on September 13, 1982; Global requested additional time to obtain the requested data from the Department of Interior's Minerals Management Service. This process was cut short by subsequent events.

*Studies: 1969—1982*

The question of the value of the Osceola phosphates as a whole, and of plaintiffs' discoveries specifically, has not suffered from lack of inquiry. The Department of Interior has generated numerous studies on this subject. Several of these are discussed briefly below.

The first of these studies—and one upon which plaintiff Kerr–McGee places particular reliance—is a United States Geological Survey (USGS) analysis of the value of Kerr–McGee's discovery. In memoranda dated March 28, 1969, and December 11, 1970, USGS advised the Bureau of Land Management (BLM) as follows: "The permittee has shown that a valuable deposit of phosphate has been discovered on the lands under application during the term of the permit.... Accordingly, it is recommended that a preference right lease be issued to the applicant."

Later studies were more broad. Among the studies completed during the 1970s was a June, 1974, economic analysis of mining in the Osceola National Forest as a whole, put forth by the Bureau of Mines. According to this analysis, the total phosphate reserves in the Forest had a net value of over $300 million, assuming the estimated cost of reclamation to be $700 per acre.

In January, 1975, the Department of Interior's Office of Minerals Policy Development prepared a document titled "Economic Evaluation of Issuing Preference Right leases for Phosphate Mining on the Osceola National Forest." The analysis concluded that if the price of phosphate continued at the then-current high level of $30 per ton, the net revenues would be $295—$413 million. The document stated that the economic accounting of "environmental costs" for the purposes

of this analysis was incomplete; it noted further that "[a]n economic evaluation of the costs and potential benefits should be performed for each stipulation imposed in either the preference right leases or in the mining plan." [5]

During the same year, employees of BLM and the Department of Interior's Office of Policy Analysis prepared an economic evaluation of "whether issuance of preference right leases for phosphate mining on the Osceola National Forest is in the public interest." The evaluation concluded that the net financial value of phosphates in the forest was between $34.6 and $107.2 million. The same document, however, included a legal analysis prepared by the Office of the Solicitor, which stated that "[t]he accounting of environmental costs performed in the economic analysis is not a full accounting" and went on to list numerous factors that "were either left out entirely or poorly accounted for in the estimates of environmental costs." [6]

Finally, in May, 1982, the USGS issued an updated economic analysis of the deposits discovered by Kerr–McGee. This document stated that "it is determined in accordance with 43 C.F.R. 3521.1–1(h) that Kerr–McGee has found a valuable deposit." However, the document declined to decide whether the reclamation planned by the applicant would satisfy the Forest Service stipulations. It concluded: "Any additional costs that might be incurred by the applicant incidental to satisfying the Forest Service stipulations cannot be determined at this time."

*The Environmental Impact Statement and Environmental Assessment*

While the various economic analyses were being undertaken, the Department of Interior, in accordance with the National Environ-

5. According to plaintiffs, neither this study nor the June, 1974 economic analysis prepared by the Bureau of Mines was disclosed to them until 1983, when both were produced in the course of discovery for a lawsuit then pending before the district court.

6. These factors were listed as follows:
(1) Aesthetic values
(2) Impacts on soil quality
(3) Impacts on surface aquifers and surface water quality

(4) Potential changes in climate and air quality
(5) Impacts on historical and archaeological values
(6) Impacts on vegetative communities
(7) Impacts on wildlife habitat other than endangered species
(8) Potential changes in the overall ecology of the Osceola National Forest
(9) The long-term consequences of potential contamination of the Florida aquifer

mental Policy Act (NEPA),[7] was simultaneously preparing and updating an Environmental Impact Statement (EIS) to assess the effects of phosphate leasing in the Osceola National Forest. On June 27, 1974, the Department of Interior issued a "Final" Environmental Statement (FES). On October 24, 1975, the Secretary of Interior, citing a need for more information, announced plans to conduct two additional years of studies on mining's consequences for water and wildlife. These studies were completed in 1978. Thereafter, BLM incorporated the results of the studies into a Supplement to the 1974 FES. The Supplemental FES was published on October 31, 1979.

However, the Supplemental FES was not destined to be the last word on the subject. On November 15, 1982, the Department of Interior notified plaintiffs of its decision to prepare an Environmental Assessment (EA). The EA was intended to provide a more detailed examination of reclamation technology than had been undertaken in either of the two prior documents.

A draft EA was completed on December 22, 1982. The draft stated that it was prepared "to aid the decision-maker, the Secretary, Department of the Interior, in his decision concerning the disposition of 41 Preference Right Lease Applications (PRLAs) on the Osceola National Forest (Osceola NF), Florida." Having assessed "field-scale capabilities of existing reclamation technologies," the draft concludes that "current technology cannot assure that the Forest Service Lease Stipulations will be met."

Subsequently, on January 7, 1983—before plaintiffs had had any meaningful opportunity to rebut the conclusions stated in the draft—the final EA was published. The final EA reiterated the findings contained in the draft, stating that "sufficient technological capabilities do not exist to ensure a reasonable likelihood of the successful reclamation of mined areas consistent with the requirements established for mining in the Osceola NF."

On January 10, 1983, three days after issuance of the final EA—and again, without allowing the lease applicants a chance to present their side of the issues—the Secretary of Interior issued a decision rejecting plaintiffs' lease applications. The Secretary concluded:

> The Department of the Interior has performed studies which indicate current technology is not capable of meeting the prescribed reclamation standards. The fact that no reclamation technology exists which can reclaim these lands precludes the possibility that this phosphate deposit could meet the valuable deposit test.

### Congress and the Courts: 1983—1994

Following the denial of the lease applications, plaintiffs' rights continued to be a matter of considerable controversy in both Congress and the courts. One bill of particular note, known as H.R. 9, would have required the Secretary of Interior to make the "valuable deposit" determination without taking into account the cost of compliance with environmental statutes and regulations. In addition, it would have prohibited mining in the Osceola National Forest and required the Government to compensate plaintiffs for any deposits deemed to be "valuable." *See* H.R. 9, 97th Cong., 2d. Sess. (1982). This bill passed both houses of Congress but was vetoed by the President on January 14, 1983, several days after the lease applications were denied.

Having failed to obtain legislative relief, plaintiffs turned to the courts. In early 1983, Kerr–McGee and Global each brought a lawsuit in the District Court for the District of Columbia, seeking an injunction to compel the Secretary of Interior to issue the leases.[8]

---

7. The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4370d (1988 & Supp. IV 1992), requires the preparation of an Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332.

8. This was not the first lawsuit prompted by the struggle between the would-be miners and those seeking to maintain the Forest intact. In 1971 the State of Florida had filed suit in D.C.District Court to enjoin the issuance of the leases pending preparation of an EIS: the motion was denied, on the ground that the Government had agreed to prepare an EIS and was suspending action on the leases. In 1976, Kerr–McGee filed suit in the District Court, seeking an order to

These lawsuits were subsequently consolidated.

Meanwhile, Congress still had its attention on the issue of phosphate mining in the Osceola. On September 28, 1984, while plaintiffs' lawsuit was pending in the District Court, the President signed the Florida Wilderness Act of 1983, which effectively prohibited the issuance of phosphate leases in the Osceola National Forest.[9]

Without regard to the passage of this Act, on February 6, 1986, the District Court issued an order granting defendant's motion for summary judgment and upholding the Secretary's decision to deny the leases. Plaintiffs appealed. On February 19, 1988, the D.C. Circuit vacated the decision, holding that "the Florida Wilderness Act now precludes the Secretary from issuing the mining leases they seek to obtain." 840 F.2d 68, 71. Thus, it concluded that " 'the necessary effect of the enactment of this statute is to make the cause a moot one.' " *Id.* (quoting *United States v. Alaska S.S. Co.,* 253 U.S. 113, 115, 40 S.Ct. 448, 448, 64 L.Ed. 808 (1920)). As a consequence, it remanded the case to the district court with instructions to dismiss the consolidated lawsuits as moot. The appellate court stated: "Our action is without prejudice to the right of appellants to file appropriate suits in the United States Claims Court seeking damages from the United States for the Secretary's allegedly improper denial of their applications for mining leases.

We intimate no views on any aspect of such suits." *Id.*

Later that same year, both Kerr–McGee and Global filed complaints in this Court, seeking compensation for an alleged unlawful taking under the Fifth Amendment. The actions were consolidated. As a result of concerns about this Court's jurisdiction, the judge to whom the lawsuit was assigned suggested that plaintiffs obtain a congressional reference. Accordingly, proceedings were stayed pending the passage of H.R. 29, which referred H.R. 477,[10] "A Bill for the relief of Global Exploration and Development Corporation, Kerr–McGee Corporation and Kerr–McGee Chemical Corporation," to this Court. The pending case was then dismissed.

### Discussion

The Congressional Reference Statute, 28 U.S.C. § 2509 (1988 & Supp. V 1993), instructs a hearing officer of this Court to proceed as follows in a congressional reference case:

> The hearing officer to whom a congressional reference case is assigned by the chief judge shall proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any

---

compel issuance of the leases; although the District Court held for Kerr–McGee, the D.C. Circuit reversed for failure to exhaust administrative remedies. Global filed two suits in 1978: one in the District Court, seeking an order to compel issuance of the leases, and the other in the Court of Claims, seeking compensation for an alleged taking. Both were dismissed for failure to exhaust administrative remedies. (In context, these repeated references to "failure to exhaust administrative remedies" are to be understood as reminders that the administrative process had not yet run its course—*i.e.,* there was no final agency decision.)

In 1980, Global again sought an injunction; this suit was later dismissed without prejudice. In 1982, the State of Florida and six environmental organizations filed suit to enjoin the issuance of leases until the Government had prepared a technical study; this suit was dismissed on the ground of ripeness.

9. Under the terms of the Wilderness Act, mining can take place if two events occur. First, the President must recommend to Congress that phosphate leases issue, based on a finding of "a clear and present national need" for phosphate that "outweighs the overall public values of the public lands involved." Second, Congress must approve the recommendation by joint resolution. Pub.L. No. 98–430, 98 Stat. 1665 (1984).

10. H.R. 477 reads in part as follows:
    The Secretary of the Treasury shall pay, out of any money not otherwise appropriated, to [plaintiffs Kerr–McGee and Global], a sum of money in compensation for any damages incurred by [plaintiffs] on account of the failure of the Secretary of the Interior to grant, and permit [plaintiffs] to conduct mining operations pursuant to, phosphate leases in the Osceola National Forest, and/or ... the enactment of the Florida Wilderness Act of 1983....
    H.R. 477, 102d Cong., 1st Sess. (1991).

established legal remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.

*Id.*, § 2509(c). Thus, we must decide whether there are any grounds on which plaintiffs are due either legal or equitable relief.

### Legal Claims

██ We begin by considering the availability of legal relief. In their brief, plaintiffs assert two legal claims. First, they state that their right to phosphate leases was not dependent on a finding by the Secretary, but, rather, vested upon discovery of a "valuable deposit". As a variation on this theme, Kerr–McGee puts forth the alternative argument that its right to the leases vested upon the determination made by USGS in 1969 "that a valuable deposit of phosphate has been discovered on the lands under application." In either case, plaintiffs contend, the Secretary's later decision to deny the lease applications amounted to the deprivation of an enforceable interest in land and hence a taking of their property.

Second, Kerr–McGee argues that even if neither the discovery of a valuable deposit nor the USGS determination automatically gave rise to an interest in property, nevertheless, in the face of USGS's favorable determination, the Secretary had no discretion to withhold the leases. The Secretary's failure to issue the leases is therefore seen as an unlawful act.

In support of their arguments, plaintiffs cite *Natural Resources Defense Council v.*

*Berklund,* 609 F.2d 553 (D.C.Cir.1979), which addressed the parallel provision of the Mineral Leasing Act dealing with coal deposits. The *Berklund* court held that a permittee who meets the statutory requirement—in that case, the discovery of coal in "commercial quantities"—is entitled to a lease. The statute's language, the court declared, "is unequivocal and clear, and compels our conclusion that the applicant who satisfies the condition is entitled to a lease." *Id.* at 557. From these statements, plaintiffs draw the conclusion that discovery alone is sufficient to create a vested interest in land.

As to plaintiffs' first claim, we do not agree that either Kerr–McGee or Global acquired a vested property right prior to the secretary's decision, and we find plaintiffs' reliance on *Berklund* to be misplaced. First, *Berklund* does not say that an applicant may satisfy the statutory standard—in our case, the "valuable deposit" test—simply by asserting that it has made the requisite discovery. If that were so, the test would be ineffective and meaningless. Clearly, the Government, not the applicant, must decide whether the test has been met.[11]

Neither does *Berklund* say that the USGS decision was in any way dispositive. As noted, Kerr–McGee would have us hold that the USGS report created a vested property right, or, alternatively, left the Secretary no discretion to deny the leases. We cannot accept either argument. Even if, as has been suggested, it may have been the Secretary's routine practice during a certain period to act on the USGS recommendation without further study, such a practice is nowhere prescribed by rule or regulation. A practice

11. In regard to this particular issue, plaintiffs draw our attention to *Patterson v. United States,* 115 Ct.Cl. 348 (1950), which involved a suit for just compensation predicated upon the flooding of plaintiffs' mining claims. There, compensation was denied due to the Secretary of Interior's finding that plaintiffs had made no valid discovery on the land in question. Plaintiffs rely, in particular, on the court's statement that the mineral law "makes the claimant's right dependent upon *discovery* of minerals, and *not upon* the Secretary's decision as to whether or not there has been a discovery." *Id.* at 353.

This statement must be placed in the proper context. The *Patterson* plaintiffs contended that

the Secretary's decision was the product of "superficial investigations" and demonstrated a disregard of "competent and weighty evidence." *Id.* Accordingly, the thrust of the court's opinion is that the Secretary is not empowered to act arbitrarily and that some type of judicial relief would be appropriate. The court concluded, however, that it did not have jurisdiction to review the Secretary's decision as to whether or not there had been a valid discovery. By proceeding to dismiss the case for lack of jurisdiction, the court sent the unambiguous message that the plaintiffs' pursuit of a "takings" action could not proceed for lack of a property interest.

that has been informally adopted may be set aside with equal informality. We do not dispute that the USGS determination could be an important factor in the lease evaluation process, but it cannot stand in place of a decision by the Secretary. *See Utah Int'l v. Andrus,* 488 F.Supp. 976, 981 (D.Colo.1980) (stating that a "determination by the USGS was an important, even critical, input to the leasing decision process, but it was not itself a decision by the responsible agency.")

Finally, we would note that the issue of whether plaintiffs acquired an enforceable property right that predated the agency's subsequent denial of their lease applications was implicitly decided against them in the 1976–1978 litigation in which Kerr–McGee sought an order compelling issuance of the leases. In that litigation, the District Court held in plaintiff's favor, finding that mandamus was warranted, *i.e.,* that, on the basis of the USGS determination, issuance of the leases was statutorily required. However, the D.C.Circuit reversed, holding that Kerr–McGee had failed to exhaust its administrative remedies. We take the appellate court's decision as meaning that plaintiffs had no enforceable right to the leases prior to a final agency decision—*i.e.,* a decision by the Secretary. Thus, we cannot, at this juncture, revisit the question of whether plaintiffs had a vested property right.

### Equitable Claims

Thus, we move on to the question of whether plaintiffs may have an equitable claim. An equitable claim arises from "an injury occasioned by Government fault" when there is "no enforceable legal remedy—due, for example, to the bar of sovereign immunity or the running of the statute of limitations." *White Sands Ranchers v. United States,* 14 Cl.Ct. 559, 565, adopted, in relevant part, 16 Cl.Ct. 13 (1988) (review panel). "[I]n order to recover under an equitable claim theory a claimant must show that: 1) the government committed a negligent or wrongful act, and 2) this act caused damage to the claimant." *California Canners & Growers v. United States,* 9 Cl.Ct. 774, 785 (1986) (review panel) (quoting *Shane v. United States,* 3 Cl.Ct. 294, 304 (1983)). Plaintiffs assert a variety of governmental wrongs as the basis for an equitable claim.

First, plaintiffs allege that the Secretary was improperly influenced by political considerations. We interpret this argument as an assertion that the Secretary decided, on the merits, that a valuable deposit had been found, but proceeded to deny the leases for reasons of political expediency. In seeking to buttress their allegation, plaintiffs focus on a period of several days in January, 1983, when two crucial decisions were made: the decision to deny the leases and the decision to veto H.R. 9. Plaintiffs' curiosity was apparently piqued by the Government's claim of executive privilege for a particular set of documents generated by the White House staff and the Office of Management and Budget during this period. These documents were submitted to Judge Parker for *in camera* review in the course of the 1983 district court action. Our own *in camera* review of these documents reveals nothing to support plaintiffs' claim of improper influence; there is no "smoking gun." Thus, we cannot conclude that political considerations swayed the Secretary from the merits of the decision. As a result, we find that plaintiffs cannot make out an equitable claim on this basis.

■ Second, plaintiffs assert that an equitable claim arises from the Government's failure to reveal, until 1983, favorable economic studies performed by the Bureau of Mines and the Office of Minerals Policy Development in 1974 and 1975. We note, however, that these studies were part of the record considered by the Secretary. Presumably, therefore, their content was taken into account. Moreover, plaintiffs had access to these studies at the crucial point in the process—that is, when the case was before the district court for review. Therefore, any deprivation of vital information the withholding of these studies may initially have entailed was overcome. In short, there is no reason to believe that plaintiffs were harmed by their earlier ignorance. Further, the opportunity to refer to these studies for whatever benefit they can now provide remains an option plaintiffs are free to exercise. Thus, the withholding of the studies provides no basis for an equitable claim.

Third, plaintiffs would ground an equitable claim in the Secretary's failure to issue the leases when, according to plaintiffs, all statutory requirements had been met. This appears to be a simple reiteration of the claim that plaintiffs had a vested property right— only this time it appears under the heading of an equitable claim, rather than a legal one. The change in label does not alter the fact that neither plaintiffs nor the USGS may independently make a determination that is entrusted to the Secretary. We thus reject any claim based on the notion that plaintiffs had a property right that predated the Secretary's decision.

■ Finally, plaintiffs complain of the Government's failure to allow them to comment on, and present evidence in regard to, the Environmental Assessment (EA). It is clear that after preparing a draft Environmental Impact Statement (EIS), an agency must request comments from the public at large, and, in particular, from the applicant. Responses to these comments must be included with the final EIS. 40 C.F.R. §§ 1503.1, 1503.4 (1983); see Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 n. 13, 109 S.Ct. 1835, 1845–46 n. 13, 104 L.Ed.2d 351 (1989). The real question is whether such solicitation of comments is also required for an EA. As to that, the regulations are silent.

In answering this question, we note that the EA had the purpose and effect of updating the EIS and its Supplement. In fact, it was initially referred to as a further "supplement" rather than as an Environmental Assessment. The need for such a document is described in an August 20, 1982 Department of Agriculture memorandum from John B. Crowell, Assistant Secretary for Natural Resources and Environment to R. Max Peterson, the Chief of the Forest Service:

> The Office of General Counsel has been concerned that the Environmental Impact Statement done some years ago in connection with the proposed phosphate leasing applications on the Osceola National Forest does not address the new technology which is being relied upon to assure adequate land reclamation when mining is completed. The Solicitor's Office of the

Department of the Interior concurs in OGC's concerns. Consequently, it has been decided by Assistant Secretary Carruthers and I that it will be necessary to prepare a supplement to the EIS. Interior has the lead in this assignment, but will rely heavily on cooperation from the Forest Service.

In a similar vein, a memorandum of September 24, 1982, from the Acting Deputy Director of BLM to the Director of BLM's Eastern States Office stated:

> Recent consultation between the Solicitor, Assistant Secretary Garrey Carruthers, officials of the Department of Agriculture (DA) and their Office of General Counsel (OGC) resulted in a decision that a document addressing new phosphate mining reclamation technology regarding the Osceola National Forest should be prepared as a supplement to the Environmental Impact Statement.

Ultimately, of course, the document was characterized as an Environmental Assessment. However, its purpose remained unchanged. The Federal Register Notice announcing preparation of the EA stated that this document would "specifically assess the impacts of current developments in reclamation techniques which were not fully analyzed at the time the Final Environmental Impact Statement on Phosphate Leasing on the Osceola National Forest, Florida (1974), and the Final Supplement (1979) were published." 47 Fed.Reg. 51,475 (1982).

Since the EA served to supplement the EIS by examining in depth issues that previously had been neglected, it cannot be seen as anything other than an extension of the EIS process. Thus, because the Government was required to solicit comments on the draft EIS, it was also required to seek comments on the draft EA. It failed to do so; therefore, we find that the Government committed a wrongful act that is amenable to equitable relief.

### The Integrity of the Secretary's Decision

We now turn to the issue of whether the Government's wrongful act caused damage to plaintiffs. In order to answer this question, we must determine whether the Secretary

could have reached a different decision on the basis of the evidence that plaintiffs would have submitted if they had had an opportunity to comment on the draft EA.

This additional evidence was submitted to the district court for its review. The evidence consists primarily of two affidavits. The first is the affidavit of Andre F. Clewell, who holds a Ph.D. in botany and who states that his expertise lies in "natural systems restoration and surface mining reclamation, plant ecology and plant taxonomy, environmental assessment and wetlands determinations, and project design and management." The second is the affidavit of Leslie G. Bromwell, a professional engineer, who claims expertise in the area of sand/clay reclamation technology.

These affidavits criticize the findings made in the EA. The EA's major findings are as follows:

> Possible presence of attapulgite clay would necessitate the use of permanent aboveground clay waste settling areas.
> Though many studies are underway, there is a lack of conclusive data on ability to reclaim wetland hardwoods, or determine that habitat of key terrestrial wildlife species can or cannot be reestablished.
> Using the Hypothetical Mining/Reclamation Plan, approximately 13,800 acres have "moderate to high" probability of being reclaimed to slash high pineland and longleaf pine flatwoods; 3858 acres of clay settling areas could be used for marsh or pasture but probably could not be returned to approximate landforms and elevations; and approximately 1478 acres of lake area would result.

In addition, the EA distinguishes between "current" and "experimental" technology. Current technology is defined as "techniques being used by the industry that are currently being permitted by the State of Florida on a non-experimental basis." The EA characterizes sand/clay reclamation technology as "experimental."

In response to the EA's findings, Clewell states that there is "a high probability" that the Forest Service stipulations can be met. With regard to wetlands, he says that "existing technology should be able to reclaim forested wetlands to meet the requirements of the stipulations." In support of this statement, he cites various studies and, in addition, the results from forest restoration projects that he has designed for Brewster Phosphates.

Clewell disputes, as well, the figures given in the EA for the probability of successfully reestablishing particular types of vegetation in the Osceola National Forest. In his opinion, the data support higher estimates of success. He suggests that this misreading of the data may be linked to the failure to include a botanist on the interagency team that prepared the EA.

Furthermore, Clewell rejects the notion, stated in the EA, that reclamation successes in central Florida might not be easily reproduced in the Osceola, which is in northern Florida. He states: "The relevant characteristics of northern Florida and central Florida are essentially identical." Thus, on the basis of Brewster's successful growth of slash pines at sand/clay reclamation sites in central Florida, he projects as good or better results in the Osceola National Forest.

Bromwell, in turn, asserts that a sand/clay reclamation program "would ensure that the Forest Service Stipulations relating to waste disposal, soil stability, reclaimed elevations and reclamation scheduling would be met." He takes issue with the EA's characterization of sand/clay technology as "experimental." In particular, he attacks the assumption that conventional above-ground waste settling areas would be necessary in the Forest. He states: "This assumption is inconsistent with present practice in the Florida phosphate industry, and is also incompatible with permitting requirements of the Florida Department of Natural Resources (DNR) and the U.S. Environmental Protection Agency."

Bromwell also differs with the EA's statements about attapulgite clays. First, he notes that "the presence of attapulgite clay in the Osceola National Forest phosphate deposits has not been established." He points out that other mining companies working near the Forest have not encountered "unusual clay volumes or poor settling-consolida-

tion behavior compared to other Florida phosphate mines." Second, he states that reclamation plans using sand/clay technology have been developed for several sites that are known to have soils with a high attapulgite content.

Bromwell, like Clewell, asserts that it is unrealistic to assume that what works in central Florida will not work in northern Florida. He states: "Sand/clay mix reclamation plans have been developed for approximately 15 Central and North Florida phosphate deposits that include a wide range of clay properties, sand to clay ratios, mining depths, mining rates, and percentage of clay in the ore body."

In considering the effect of these two affidavits, we initially ask whether, on the basis of these affidavits and supporting materials, a reasonable agency decisionmaker could have decided to issue the leases. The answer is that, at this stage, we cannot rule out such a possibility. Had the Secretary had the opportunity to evaluate the views propounded by Messrs. Clewell and Bromwell, the outcome *might* have been different. Thus, we are left with the question of how the leasing decision might best be re-evaluated in light of the additional evidence, and who is best situated to undertake such an evaluation.

### A New Hearing

In the ordinary case, where the agency has failed to consider all relevant factors, the usual action by the reviewing court is a remand to the agency. "The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).

Here, however, we are faced with an unusual situation. First, we are not in the same posture as a district court acting under the Administrative Procedure Act. Rather, our jurisdiction derives from the congressional reference itself. Pursuant to statute, in a congressional reference case we are specifically empowered "to determine the facts" to which our conclusions of law will be appended. 28 U.S.C. § 2509(c).

Second, unlike this court, the Secretary of Interior is no longer empowered to make the "valuable deposit" determination with respect to plaintiffs' lease applications. The judicial review process, with its opportunity for remand to cure administrative errors, was cut short by the D.C.Circuit's finding that, in light of the Florida Wilderness Act, the question of unlawful lease denial was moot. Thus, the agency could not now revisit the problem unless Congress were to specifically grant it that authority.

Defendant urges us to recommend to Congress that it reestablish the Secretary's authority to consider the merits of plaintiffs' lease applications. This request brings us to the third point that guides us here, namely, the extraordinary amount of time and resources that this dispute has thus far consumed. We have no wish to further prolong the process of deciding the validity of plaintiffs' claims. "Fairness to the plaintiffs ... militates strongly against the adoption of the government's suggestion" that the case be remanded to the agency. *See Skaw v. United States*, 740 F.2d 932, 938 (Fed.Cir.1984).

We conclude, therefore, that it would be inappropriate to end the present proceedings with a recommendation that Congress reempower the Department of Interior to decide the merits of the lease applications. This court can and should receive and weigh the evidence to determine whether, as of January, 1983, the feasibility of reclamation, as tested by the demands of the Forest Service stipulations, could be assured. The answer to that question will decide whether the "valuable deposit" test had been met.