**KERR–McGEE CORPORATION; Kerr–McGee Chemical Corporation; and Global Exploration and Development Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Cong.Ref. No. 92–718 X.**

United States Court of Federal Claims.

Nov. 18, 1996.

Peter J. Nickles, Steven J. Rosenbaum, Eric Dodson Greenberg, Covington & Burling, Washington, D.C., for Kerr–McGee Corporation and Kerr–McGee Chemical Corporation.

Elmo Hoffman, Brownlee, Hoffman & Jacobs, P.C., Orlando, FL, for Global Development Corporation.

Gerald S. Fish and Lewis S. Wiener, Department of Justice, Washington, D.C., for defendant.

## HEARING OFFICER'S REPORT

WIESE, Hearing Officer:

### Introduction

In an earlier phase of this congressional reference litigation, this court, sitting in the capacity of a hearing officer under 28 U.S.C. § 2509, determined that the Secretary of the Interior had committed legal error in denying plaintiffs' applications for phosphate mining leases on the basis of an environmental study whose adverse findings plaintiffs had not been given the opportunity to challenge in an evidentiary hearing. *Kerr–McGee Corp. v. United States,* 32 Fed.Cl. 43, 51 (1994). The court went on to decide that the error was not harmless—the excluded evidence had the potential to change the result—and plaintiffs were therefore entitled to a trial before the court to offer evidence proving that they could, in fact, have met prescribed post-mining reclamation standards and, by so doing, have established their statutory right to the mining leases at issue. *Id.* at 53.

The trial contemplated by the court's ruling was held from November 13, 1995 to December 14, 1995. Following the conclusion of the trial but before the court had issued a decision in the matter, the parties filed a document, titled "Joint Proposed Findings of Fact, Conclusions of Law and Recommendation Regarding Entry of Report Concerning Claims of Plaintiffs" which, in effect, proposes a stipulated settlement of the controversy and asks the court to adopt the same as the basis for its decision in the case. We proceed by reviewing the parties' stipulation and discussing the reasons for adopting their compromise. To put the matter in perspective, we briefly recount below the events that have led to the present circumstances. A more complete recitation of the facts, we should add, appears in the court's earlier opinion in this case as well as in the accompanying appendix which sets out the parties' proposed findings of fact as adopted by the court.

### The Factual Background— A Brief Recapitulation

On September 10, 1992, there was referred to the chief judge of this court a bill, H.R. 477, for the conduct of proceedings in accordance with 28 U.S.C. § 2509—the Congressional Reference Statute. The bill, titled "A Bill for the relief of Global Exploration and Development Corporation, Kerr–McGee Cor-

poration and Kerr–McGee Chemical Corporation," reads in part as follows:

The Secretary of the Treasury shall pay, out of any money not otherwise appropriated, to [plaintiffs Kerr–McGee and Global], a sum of money in compensation for any damages incurred by [plaintiffs] on account of the failure of the Secretary of the Interior to grant, and permit [plaintiffs] to conduct mining operations pursuant to, phosphate leases in the Osceola National Forest, and/or ... the enactment of the Florida Wilderness Act of 1983 ...

H.R. 477, 102d Cong., 1st Sess. (1991).

In implementation of this reference, the chief judge appointed the undersigned judge to serve as hearing officer and Judges Robinson, Margolis and Futey to serve as members of the Review Panel. As directed by the terms of 28 U.S.C. § 2509, the hearing officer is charged with responsibility for determining the facts and for rendering conclusions "sufficient to inform Congress whether the [claimant's] demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

The events that led to the enactment of H.R. 477 began more than thirty years ago, in 1964 and 1965, when plaintiffs first filed applications for phosphate prospecting permits on lands in the Osceola National Forest. These permits were granted and, following plaintiffs' discovery of phosphate deposits on the lands, the question arose whether plaintiffs were entitled to leases permitting them to mine the deposits. Put in terms of the statutory criterion, the question was whether plaintiffs could satisfy the "valuable deposits" test that is prescribed by the Mineral Leasing Act of 1920, as amended, 30 U.S.C. §§ 181–287 (1988 Supp. IV 1992) as a condition for the issuance of a phosphate mining lease.

In 1983, following numerous studies conducted by the Department of Interior, the Secretary of the Interior concluded that sufficient technological capabilities did not exist to ensure a reasonable likelihood of the successful reclamation of mined areas consistent with stipulations (i.e., standards) that had been established for that purpose by the

United States Forest Service—the agency charged with the primary responsibility for protecting the lands in question. Specifically, plaintiffs were advised that:

The Department of the Interior has performed studies which indicate current technology is not capable of meeting the prescribed reclamation standards. The fact that no reclamation technology exists which can reclaim these lands precludes the possibility that this phosphate deposit could meet the valuable deposit test.

The Secretary's conclusions were based on an Environmental Assessment (EA) prepared by the United States Department of Interior. In connection with the preparation of this study, representations had been made by agency personnel that plaintiffs would be given the opportunity to comment on the findings and conclusions in the EA before it was issued in final form. That opportunity, however, was not afforded plaintiffs. The conclusions reached in the EA were accepted by the Secretary without further examination.

Over the next several years plaintiffs sought unsuccessfully to obtain relief from the Secretary's decision through the courts. They were not successful. What thwarted their efforts in this regard was the enactment in 1983 of the Florida Wilderness Act, Pub.L. No. 98–430, 98 Stat. 1665 (1984). Because that Act effectively foreclosed the Secretary from issuing phosphate mining leases in the Osceola National Forest, it thereby also mooted any rights plaintiffs might have had either to compel the Secretary to reopen his decision denying their mining leases or to demand just compensation on account of the alleged erroneous denial of those leases. Plaintiffs were left without an effective legal remedy. These then, were the circumstances which brought forth H.R. 477.

After plaintiffs filed their congressional reference actions in this court, defendant United States moved for summary judgment. The United States contended that plaintiffs could not, as a matter of law, establish a legal or equitable claim. Plaintiffs responded to the Government's motion and, on September 12, 1994, this court issued a decision granting

in part, and denying in part, that motion. *Kerr–McGee Corp. v. United States,* 32 Fed. Cl. 43 (1994). The court ruled that plaintiffs did not have a legal claim to recovery, 32 Fed.Cl. at 50. The court also held, however, that in failing to solicit comments on the draft EA, "the Government committed a wrongful act that is amenable to equitable relief." *Id.* at 51. The court went on to hold that it "should receive and weigh evidence to determine whether, as of January, 1983, the feasibility of reclamation, as tested by the demands of the Forest Service stipulations, could be assured. The answer to that question [the court further noted] will decide whether the 'valuable deposit' test had been met." *Id.* at 53.

### The Parties' Joint Submission

Following the conclusion of the evidentiary hearing but before a decision was entered in the case, the parties filed the document now before the court—the "Joint Proposed Findings of Fact, Conclusions of Law and Recommendation Regarding Entry of Report Concerning Claims of Plaintiffs." The parties ask that this "joint submission"—its findings and conclusions—be adopted by the court as the basis for its report to the Congress.

Most of the proposed findings set out in the joint submission focus on the history of the case and, as such, demand no special attention. Indeed, those proposed findings already stand as fact given the court's reliance on them as the basis for its earlier decision. What is of importance now are the findings describing the evidence that was produced at the hearing, the parties' assessment of that evidence and, last, the conclusions the parties would offer the court on the basis of that evidence. These proposed findings read as follows:

· At the evidentiary hearing, Kerr–McGee and Global submitted evidence and expert testimony tending to demonstrate the viability in 1983 of the sand/clay mix reclamation technology.

· At the evidentiary hearing, Kerr–McGee and Global submitted evidence and expert testimony tending to demonstrate the technological viability in 1983 of re-establishing watercourses, soil stability and productivity, approximate landforms and elevations, and wetlands and uplands of similar vegetative communities with species diversity in approximate proportions as those existing prior to mining.

· At the evidentiary hearing, Kerr–McGee and Global submitted evidence and expert testimony tending to demonstrate that the more serious environmental concerns identified in the EA did not apply to the lands for which Kerr–McGee and Global sought mining leases.

· At the hearing, the government presented testimony tending to show the lack of concrete evidence of the technological capability of plaintiffs to reclaim Forest land, after the mining of phosphate, to the extent required by the Forest Service stipulations.

· The parties' evidence is sharply conflicting, and the parties strongly disagree as to what that evidence proves.

· Had the case proceeded to the damages phase, Kerr–McGee and Global would each have presented evidence supporting claims substantially in excess of 10 million.

Based on the evidence, together with the court's earlier ruling in plaintiffs' favor, the parties proposed the following findings as a basis for the settlement of this lawsuit:

· It is stipulated that plaintiff Kerr–McGee has an equitable claim against the United States stemming from the irregularities which attended the processing, and the ultimate rejection, of its several applications for phosphate leases in the Osceola National Forest.

· It is stipulated that plaintiff Global has an equitable claim against the United States stemming from the irregularities which attended the processing, and the ultimate rejection, of its several applications for phosphate leases in the Osceola National Forest.

· It is agreed that the sum of ten million dollars ($10,000,000) should be appropriated and awarded to Kerr–McGee in settlement and in full satisfaction of all claims stemming from the rejection of

its applications for phosphate leases in the Osceola National Forest.

- It is agreed that the sum of nine million five hundred thousand dollars ($9,500,000) should be appropriated and awarded to Global in settlement and in full satisfaction of all claims stemming from the rejection of its applications for phosphate leases in the Osceola National Forest.

- It is agreed that there is no issue of delay, laches, statute of limitations, or failure to resort to any established legal remedy, as to Kerr–McGee's or Global's claims.

Based on the foregoing, plaintiffs ask that the court report to Congress that their demands constitute equitable claims, not gratuities, and that the amounts equitably due from the United States to Kerr–McGee and Global are, respectively, $10,000,000 and $9,500,000.

### Discussion

In order to bring this litigation within the class of suits qualifying for relief under the Congressional Reference Statute, the parties have stipulated to the existence of equitable claims against the United States, in favor of Kerr–McGee and Global, based upon the irregularities which attended the processing and ultimate rejection of their several applications for phosphate mining leases in the Osceola National Forest. The court, in turn, is asked to endorse the stipulation and, on the basis thereof, to issue a report recommending that Congress pay the amounts that have been agreed to. In support of this request, the parties have referred the court to a number of congressional reference actions in which the hearing officer's recommendation for relief was founded on a stipulation of counsel acknowledging the existence of an equitable claim. These cases, the parties maintain, affirm the principle that the resolution of a congressional reference action may proceed as well upon the litigants' own compromise of the matter in dispute as upon a resolution grounded on determinations of fact and law entered by the hearing officer. Although the court agrees with the parties' position, a word of explanation is in order.

■ As stated in our earlier opinion in this case, an equitable claim within the meaning of the Congressional Reference Statute requires proof not only of the Government's commission of a negligent or wrongful act, but also a demonstration of injury to the claimant due to this act. *Kerr–McGee Corp. v. United States*, 32 Fed.Cl. at 50. In the cases which counsel now rely on, both of these elements were satisfied. That is to say, the stipulation which the hearing officer was urged to accept included not only the parties' agreement as to the existence of an equitable claim but also the facts giving rise to that claim.

Thus, for example, in *Amick v. United States*, 5 Cl.Ct. 426 (1984), the equitable claim rested on facts tracing the flooding of claimant's land to errors by the Corps of Engineers in its calculation of the downstream channel capacity of a flood control dam. Similarly, in *Adler Constr. Co. v. United States*, 199 Ct.Cl. 809 (1972) the parties' stipulation of an equitable claim drew on facts showing that, because of specification deficiencies, the claimant—a government contractor—had incurred substantial extra performance costs, the recovery of which was barred at law because of a release agreement. And, more recently, in *Chapman v. United States*, Cong.Ref. No. 1–86 (Cl.Ct. Dec. 20, 1989) (unpublished), the equitable claim was premised on facts connecting the injuries of claimant's decedent to an assault suffered at the hands of a military prisoner who had been allowed to participate in a supervised work-release program.

■ As noted, in these cases the factual predicate for the parties' recognition of an equitable claim was spelled out. In the case at hand, however, the stipulation simply recites that plaintiffs, Kerr–McGee and Global, have equitable claims against the United States "stemming from the irregularities which attended the processing, and the ultimate rejection, of [their] several applications for phosphate leases in the Osceola National Forest." The question, therefore, is whether a stipulation thus limited in its factual scope is sufficient to support the equitable entitle-

ment that the parties are asking the court to endorse.

The answer is yes. In truth, there is little reason to distinguish between a stipulation of equitable entitlement that articulates the specific nature of the claimant's injury and a stipulation that simply expresses the parties' ultimate conclusion regarding entitlement. In either case, it is the parties' assessment of the merits of the claim—and the compromise that assessment has led to—that the court is being asked to endorse.

So viewed, the only real question concerns the integrity of the proposed settlement: is the decision to settle founded on a reliable evidentiary record? On that score, there can be no doubt. Proceedings in a congressional reference action are conducted with the same rigor and under the same ground rules that govern suits on the court's general jurisdiction docket. The proceedings are adversarial in nature, witnesses are subject to cross-examination, and the evidence offered is subject to constraints of the Federal Rules of Evidence. Given the reliability of the evidentiary record, the court is fully persuaded to accept the parties' assessment of the evidence and the subsequent determination to resolve the dispute on their own. Indeed, a refusal to honor that determination is to force on the parties the very risks their compromise seeks to avoid. Since we do not impose such a limitation on the cases that regularly come before the court—there, in fact, settlements are actively encouraged— we should not impose such a limitation on congressional reference actions.

Moreover, even if one were to look beyond the probative integrity of the trial evidence for assurance of the soundness of the parties' proposed compromise, such proof is at hand. Two reasons, in particular, would commend a compromise here.

First is the nature of the dispute. What we face in this case is not a question of ascertaining the truth from conflicting testimony about past events. Rather, the dispute is about the reliability of scientific judgments concerning the feasibility of reclamation and the adequacy of the data base from which those judgments have been drawn. It is a subject on which the experts differ and the evidence on the issue—as the parties properly describe it in their proposed findings—is "sharply conflicting." In truth, the evidence is such that it reasonably could be evaluated to support a decision either way. There simply is no ultimately correct answer to the question whether Kerr–McGee and Global could have satisfied the Forest Service stipulations. This being the nature of the dispute, a settlement of the case would entail no disservice to the private and public interests at stake.

The second reason that argues in favor of a settlement of this case is the elimination of additional risk. That is to say, if the case were to proceed to final disposition and plaintiffs to prevail, then the Government would face a potential liability substantially in excess of the proposed settlement amounts.

Conversely, however, a victory for the Government would not assure it of protection against all future liability. Under the terms of the Florida Wilderness Act of 1983, the Osceola National Forest can be reopened to phosphate mining if the President were to recommend, and the Congress, by joint resolution, approve, the issuance of phosphate leases based on a finding of "a clear and present national need" for phosphate "that outweighs the overall public values of the public lands involved." Pub.L. No. 98–430, 98 Stat. 1665 (1984). If, under the terms of this law, phosphate mining on the Osceola National Forest were to become possible at some future date, then the stage would be set for a revival of plaintiffs' claims. At that future date, plaintiffs legitimately could say that they have an equitable claim to the phosphate deposits they discovered. Thus, only a payment to plaintiffs in full compensation for the intrinsic value of their leases could foreclose such a potential future claim.

Thus, in view of the long pendency of this litigation in various forums, the evidence received by the court, and the parties' legitimate interest in settling the action, the court concludes that the parties' proposed compromise should be approved. The court adopts the findings of the parties and concludes that the settlement is fair, just, equitable, and supported by the evidence.

## Conclusion

For the reasons stated in this report, it is recommended that the referenced bill, H.R. 477, 102d Cong., 1st Sess. (January 10, 1991) be approved, and that payment be authorized and directed as follows: to Kerr–McGee Corporation, the sum of ten million dollars ($10,000,000), and to Global Exploration and Development Corporation, the sum of nine million, five-hundred thousand dollars ($9,500,000). Such compensation to Kerr–McGee and Global would not be a gratuity.

## APPENDIX

### Findings of Fact

1. This matter arises pursuant to Congressional reference. On July 21, 1992, the United States House of Representatives passed House Resolution 29, which referred to the United States Claims Court H.R. 477, a bill for the relief of Kerr–McGee and Global.

2. The proceedings of a Congressional reference are defined by 28 U.S.C. § 2509, which requires the hearing officer to report "conclusions sufficient to inform Congress whether [plaintiff's] demand is a legal or equitable claim or a gratuity, and the amount if any, legally or equitably due from the United States to the claimant."

3. The reference specifically authorized the hearing officer to hold hearings to determine whether there was a legal or equitable claim arising from "the failure of the Secretary of the Interior to grant, and permit [Kerr–McGee and Global] to conduct mining operations pursuant to, phosphate leases in the Osceola National Forest and/or the enactment of the Florida Wilderness Act of 1983."

4. Pursuant to the Congressional reference, Kerr–McGee filed a complaint, and the clerk of the Court of Federal Claims docketed Kerr–McGee's Congressional reference case on October 15, 1992. Pursuant to the Congressional reference, Global filed a complaint, and the Clerk of the Court of Federal Claims docketed Global's Congressional reference case on December 23, 1992. In their complaints, Kerr–McGee and Global alleged, *inter alia*, that the United States had de-

### APPENDIX—Continued

prived them of a vested interest in mining leases for which monetary relief was due as a legal and equitable right. This court consolidated the two cases.

5. On September 11, 1964, Kerr–McGee had filed with the United States Department of the Interior, Bureau of Land Management ("BLM"), five applications for phosphate prospecting permits covering acquired lands in the Osceola National Forest in Florida. On March 10, 1965, Global had filed with BLM nine applications for phosphate prospecting permits covering acquired lands in the Forest. On September 27, 1967, Global had filed with BLM an additional application for a phosphate prospecting permit covering acquired lands in the Forest. The applications were made pursuant to Section 211(b) of the Mineral Lands Leasing Act, 30 U.S.C. § 211(b), and the Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351–59.

6. The Mineral Leasing Act of 1920, as amended, 30 U.S.C. §§ 181–287 (1988 & Supp. IV 1992), sets forth the statutory scheme for phosphate leasing. It provides that "[w]here prospecting or exploratory work is necessary to determine the existence or workability of phosphate deposits in any unclaimed, undeveloped area, the Secretary of the Interior is authorized to issue, to any applicant qualified under this chapter, a prospecting permit which shall give the exclusive right to prospect for phosphate deposits . . .; and if prior to the expiration of the permit the permittee shows to the Secretary that valuable deposits of phosphate have been discovered within the area covered by his permit, the permittee shall be entitled to a lease for any or all of the land embraced in the prospecting permit." 30 U.S.C. § 211(b).

7. In addition, pursuant to 30 U.S.C. § 352, the United States Secretary of Agriculture, as the "head of the executive department . . . having jurisdiction" over national forests, must consent to the issuance of leases on acquired lands in a national forest, and any lease issued for such lands is "subject to such conditions as that official may prescribe to insure the adequate utilization of the lands for the primary purposes for which they have been acquired or are being administered."

APPENDIX—Continued

8. At the time Kerr–McGee's and Global's prospecting permit applications were filed, the Department of the Interior's regulations provided that "[a] permittee who, prior to the expiration of his permit, shows to the Secretary that valuable phosphate deposits have been discovered upon the land covered by the permit is entitled to a preference rights lease for all or part of the land in a reasonably compact form." 26 Fed.Reg. 5261, 5263 (1961).

9. Pursuant to its statutory and regulatory regime, the Department of Interior decided to issue prospecting permits to Kerr–McGee and Global. The United States Forest Service, an agency within the Department of Agriculture, concurred in the decision on the condition that stipulations to protect surface resources could be imposed at a later date if Kerr–McGee or Global were to apply for leases. Accordingly, in 1965 Kerr–McGee received three prospecting permits from the Department of the Interior covering lands in the Osceola National Forest in Florida: BLM–A–079904, BLM–A–079905, and BLM–A–079906. In 1966, Kerr–McGee received two more prospecting permits for which it had applied: BLM–A–079903 and BLM–A–079907. In 1965, Global received nine prospecting permits from the Department of the Interior covering lands in the Osceola National Forest: BLM–A–080630, BLM–A–080631, BLM–A–080632, BLM–A–080633, BLM–A–080634, BLM–A–080635, BLM–A–080636, BLM–A–080637, and BLM–A–080638. In 1968, Global received two additional prospecting permits for which it had applied: ES–3181 and ES–3208.

10. Pursuant to the permits, Kerr–McGee and Global engaged in extensive exploration and prospecting, which resulted in the discovery of phosphate deposits on the lands in question.

11. On January 20, 1969, Kerr–McGee filed applications with the Department of the Interior, Bureau of Land Management, for leases based upon the discovery of phosphates in the lands described in permit BLM–A–079905, and portions of the lands described in permits BLM–A–079904 and

APPENDIX—Continued

BLM–A–079906. On August 13, 1970, Kerr–McGee filed similar applications concerning the discovery of phosphate deposits on the lands described in permits BLM–A–077903, and BLM–A–079907. On August 25, 1971, Global filed applications with the United States Department of the Interior, Bureau of Land Management, for leases based on the discovery of valuable deposits of phosphate on the lands described in permits BLM–A–080632, BLM–A–080634, and BLM–A–080638. On May 27, 1972, Global filed similar applications concerning the discovery of phosphate deposits on the lands described in permits ES–3181 and ES–3208.

12. In June, 1974, an employee of the Bureau of Mines, a division of the United States Department of the Interior, prepared an economic analysis of mining in the Osceola National Forest. According to this analysis, the total phosphate reserves in the Forest had a net value of over $300 million, assuming the estimated cost of reclamation to be $700 per acre.

13. In 1975, employees of BLM and the Department of Interior's Office of Policy Analysis prepared an economic evaluation of "whether issuance of preference right leases for phosphate mining on the Osceola National Forest is in the public interest." The evaluation concluded, without full accounting of environmental costs, that the net financial value of phosphates in the Forest was between $34.6 and $107.2 million.

14. In January, 1975, employees of the Department of Interior's Office of Minerals Policy Development prepared a document titled "Economic Evaluation of Issuing Preference Right Leases for Phosphate Mining on the Osceola National Forest." The analysis concluded, without full accounting of environmental costs, that if the price of phosphate continued at the then-current level of $30 per ton, the net revenues would be between $295 million and $413 million.

15. In order to analyze and assess the environmental impacts associated with the proposed mining in the Osceola National Forest, the Department of the Interior prepared an Environmental Impact Statement ("EIS"), pursuant to the National Environmental Policy Act ("NEPA"), 42

U.S.C. §§ 4321, *et seq.* On June 27, 1974, the Department of Interior issued a "Final" Environmental Statement ("FES"). Two additional years of studies concerning the consequences for water and wildlife from mining were completed in 1978 and incorporated into a Supplement to the 1974 FES. The Supplemental FES (the "Supplement") was published on October 31, 1979.

16. On April 13, 1976, Kerr–McGee filed suit in the United States District Court for the District of Columbia seeking an order that would require the immediate issuance of leases. *Kerr–McGee Chemical Corp. v. Kleppe,* Civil Action No. 76–0608 (D.D.C.). The district court held that Kerr–McGee had discovered a valuable deposit and ordered that leases be issued by the Department of the Interior.

17. On March 28, 1978, the United States Court of Appeals for the District of Columbia Circuit reversed the orders of the district court *per curiam* on grounds that "[a]ppellee should have exhausted its administrative remedies before seeking the writ [of mandamus] or petitioning for judicial review." *Kerr–McGee Chemical Corp. v. Andrus,* Nos. 77–1478, 77–1483, 574 F.2d 637 (Mar. 28, 1978).

18. On April 11, 1978, Global filed suit in the United States District Court for the District of Columbia to compel the Secretary of the Interior to issue phosphate leases in response to Global's lease applications. *Global Exploration and Development Corp. v. Andrus,* CA 78–0642 (D.D.C.). On August 14, 1978, the district court dismissed Global's suit upon finding, *inter alia,* that Global had failed to exhaust its administrative remedies.

19. Global also brought an action in the United States Court of Claims on April 4, 1978, seeking damages for the failure of the Secretary of the Interior to issue phosphate leases to it. The court dismissed the action on September 29, 1978, citing the district court's opinion finding that Global had failed to exhaust its administrative remedies. *Global Exploration and Development Corp.*

*v. United States,* 218 Ct.Cl. 655, 1978 WL 23845 (1978) (Order).

20. In August 1980, Global initiated a second suit in the United States District Court for the District of Columbia (*Global Exploration and Development Corporation v. Andrus,* Civil No. 80–1085) in which it once again sought to compel the issuance of the phosphate leases for which it had applied. That action was dismissed on December 4, 1980, without prejudice to Global's right to reopen the action if then pending legislation that would moot the action was not enacted into law.

21. Kerr–McGee submitted a Preliminary Mining and Reclamation Plan to the Department of the Interior in compliance with the "initial showing" requirements of 43 C.F.R. § 3521.1–1(b). In its initial showing, Kerr–McGee had to describe the measures that it intended to take to mitigate the environmental effects of mining in the Osceola National Forest. In the Plan that it submitted as an initial showing, Kerr–McGee stated that it would be using a sand/clay reclamation technique that had been developed at Brewster Phosphates, a company in which Kerr–McGee was a partner. BLM accepted Kerr–McGee's initial showing on May 19, 1981. As a result, on June 10, 1981, BLM asked the Forest Service to prepare the final stipulations for Kerr–McGee's requested leases.

22. On August 14, 1978, Global submitted materials in compliance with the "initial showing" requirements. On January 29, 1981, and on July 17, 1981, Global submitted additional data in response to requests by the Department of the Interior. On September 18, 1981, BLM accepted Global's initial showing. As a result, on October 7, 1981, BLM asked the Forest Service to prepare the final stipulations for Global's requested leases.

23. On February 3, 1982, the Forest Service gave BLM the requested stipulations for Kerr–McGee and Global. The stipulations included the following requirements for reclamation:

1. The lessee shall restore the capability of the lease areas to fulfill the primary purposes for which the lands were acquired or are being administered. Those

primary purposes are regulation of the flow of navigable streams and the production of timber, and, for example, recreation and wildlife.

.    .    .    .    .

4. The lessee shall, except for permanent lakes created by mining, reestablish watercourses, soil stability and productivity, approximate landforms and elevations, and wetland and upland of similar vegetative communities and species diversity in approximate proportions as those existing prior to mining. The purpose of reclamation is to reestablish plant and aquatic communities with similar interspersion of community types, i.e., pine flatwoods, cypress swamps, creek swamps and lakes....

24. On March 25, 1982, Kerr–McGee submitted its "final showing" to BLM. In its final showing, Kerr–McGee was required to show the economic viability of a mining operation, taking into account costs of compliance with environmental regulations and lease terms. Kerr–McGee submitted additional information on April 23, 1982.

25. On June 25, 1982, Global submitted its "final showing" to BLM. On September 13, 1982, the Department of the Interior requested supplemental data regarding Global's final showing. On October 4, 1982, Global informed the Department that it had, in turn, requested the necessary data from the Minerals Management Service of the Department of the Interior and, accordingly, Global requested an extension of time in which to supplement its final showing.

26. On November 15, 1982, the Department of Interior notified Kerr–McGee, Global and the other lease applicants of its decision to prepare an Environmental Assessment ("EA") in order to provide a more detailed examination of reclamation technology than was contained in the FES or the Supplement.

27. Representations were made by agency personnel to the effect that Kerr–McGee and Global would be given an opportunity to comment on the findings and conclusions of the draft EA before it was issued in final form.

28. A draft EA was completed on December 22, 1982.

29. The final EA was issued on January 7, 1983. The final EA stated that "sufficient technological capabilities do not exist to ensure a reasonable likelihood of the successful reclamation of mined areas consistent with the requirements established for mining in the Osceola NF."

30. Based upon the conclusions of the final EA, the Secretary of Interior issued decisions on January 10, 1983, rejecting Kerr–McGee's and Global's lease applications. Notwithstanding the representations referred to in paragraph 27, Kerr–McGee and Global had not been given the opportunity to comment on, or respond to, the draft or final EA prior to the Secretary's decisions.

31. On February 4, 1983, Kerr–McGee filed suit, challenging the Secretary's denial of the leases in a complaint filed in the United States District Court for the District of Columbia. *Kerr–McGee Corp. v. Watt,* Civil Action No. 83–0322. Kerr–McGee requested an injunction to compel the Secretary of Interior to issue leases to Kerr–McGee to mine phosphate in the Osceola National Forest. Global reactivated its previously abated action in the District Court for the District of Columbia, *Global Exploration and Development Corp. v. Watt,* Civil Action No. 80–1085. Global sought an injunction to compel the Secretary of the Interior to issue leases. The two lawsuits were consolidated by the district court.

32. In September 1984, Congress enacted the Florida Wilderness Act of 1983, Pub.L. No. 98–430, 98 Stat. 1665 (1984). The Act effectively prohibits the issuance of leases to mine phosphate in the Osceola National Forest.

33. On February 6, 1986, the district court denied the relief sought by Kerr–McGee and Global, and granted the defendant's motion for summary judgment.

34. On February 19, 1988, the Court of Appeals for the District of Columbia Circuit vacated the district court's judgment in *Kerr–McGee Corp. v. Hodel,* and remanded the case to the district court "with instructions to dismiss the suit[ ] as moot" after

finding that "the Florida Wilderness Act now precludes the Secretary [of the Interior] from issuing the leases [Kerr–McGee and Global] seek to obtain." The court declared its action to be "without prejudice to the right of [Kerr–McGee and Global] to file appropriate suits in the United States Claims Court seeking damages from the United States for the Secretary's allegedly improper denial of their applications for mining leases." 840 F.2d 68, 71 (D.C.Cir.1988). The district court subsequently dismissed the action.

35. On July 13, 1988, Kerr–McGee filed a complaint in the United States Claims Court, *Kerr–McGee Corp. v. United States*, No. 407–88L, alleging that Kerr–McGee had been deprived of its interest in mining leases to which it was entitled and that the deprivation constituted a taking under the Fifth Amendment of the United States Constitution. A lawsuit setting forth the same claims was filed by Global on October 11, 1988. *Global Exploration and Development Corp. v. United States*, No. 587–88L. Global's action was consolidated with Kerr–McGee's suit. The Claims Court expressed concern that it lacked jurisdiction to resolve Kerr–McGee's and Global's claims, and suggested that a Congressional reference be obtained.

36. Following passage of House Resolution 29, which referred to the Claims Court, H.R. 477, a bill for the relief of Kerr–McGee and Global, the initial Claims Court actions were withdrawn. On December 1, 1992, and December 23, 1992, respectively, Kerr–McGee and Global filed their Congressional reference actions, which were consolidated by this court.

37. The government moved for summary judgment contending that Kerr–McGee and Global could not establish a legal or equitable claim as a matter of law.

38. On September 12, 1994, this court, sitting as a Hearing Officer by Congressional reference, granted in part and denied in part the government's motion. The court ruled that Kerr–McGee and Global have no legal claim to recovery. 32 Fed.Cl. 43, 50. The court also held, however, that in failing to

solicit comments on the draft EA, "the Government committed a wrongful act that is amenable to equitable relief." *Id.* at 51.

39. An equitable claim arises from "an injury occasioned by Government fault" when there is "no enforceable legal remedy—due, for example, to the bar of sovereign immunity or the running of the statute of limitations." *White Sands Ranchers v. United States,* 14 Cl.Ct. 559, 565, *adopted in relevant part,* 16 Cl.Ct. 13 (1988) (review panel). " '[I]n order to recover under an equitable claim theory a claimant must show that: 1) the government committed a negligent or wrongful act, and 2) this act caused damage to the claimant.' " *California Canners & Growers v. United States,* 9 Cl.Ct. 774, 785 (1986) (review panel) (quoting *Shane v. United States,* 3 Cl.Ct. 294, 304 (1983)).

40. The court found that the EA was an extension of the EIS process under NEPA and the government was required to solicit the comments of the lease applicants. The court held that the failure of the Secretary of the Interior to solicit comments on the draft EA was a "wrongful act that is amenable to equitable relief." 32 Fed.Cl. 43, 51.

41. The Court ruled that Kerr–McGee and Global would be entitled to equitable relief if they could show that the government's wrongful act caused them damages. Thus, the issue to be decided by the court was whether Kerr–McGee or Global could demonstrate that the Secretary of Interior "could have reached a different decision on the basis of the evidence that [Kerr–McGee and Global] would have submitted if they had had an opportunity to comment on the draft EA." 32 Fed.Cl. 43, 51–52.

42. Accordingly, pursuant to its authority, the court held an evidentiary hearing from November 13, 1995, through December 14, 1995, to receive and weigh evidence to determine whether, as of January 1983, the feasibility of reclamation, as tested by the demands of the Forest Service stipulations, could be assured. *See* 32 Fed.Cl. 43, 53.

43. At the evidentiary hearing, Kerr–McGee and Global submitted evidence and expert testimony tending to demonstrate the

viability in 1983 of the sand/clay mix reclamation technology.

44. At the evidentiary hearing, Kerr–McGee and Global submitted evidence and expert testimony tending to demonstrate the technological viability in 1983 of reestablishing watercourses, soil stability and productivity, approximate landforms and elevations, and wetlands and uplands of similar vegetative communities with species diversity in approximate proportions as those existing prior to mining.

45. At the evidentiary hearing, Kerr–McGee and Global submitted evidence and expert testimony tending to demonstrate that the more serious environmental concerns identified in the EA did not apply to the lands for which Kerr–McGee and Global sought mining leases.

46. At the hearing, the government presented testimony tending to show the lack of concrete evidence of the technological capability of plaintiffs to reclaim Forest land, after the mining of phosphate, to the extent required by the Forest Service stipulations.

47. The parties' evidence is sharply conflicting, and the parties strongly disagree as to what that evidence proves.

48. Had the case proceeded to the damages phase, Kerr–McGee and Global would each have presented evidence supporting claims substantially in excess of $10 million.

49. It is stipulated that plaintiff Kerr–McGee has an equitable claim against the United States stemming from the irregularities which attended the processing, and the ultimate rejection, of its several applications for phosphate leases in the Osceola National Forest.

50. It is stipulated that plaintiff Global has an equitable claim against the United States stemming from the irregularities which attended the processing, and the ultimate rejection, of its several applications for phosphate leases in the Osceola National Forest.

51. It is agreed that the sum of ten million dollars ($10,000,000) should be appropriated and awarded to Kerr–McGee in settle-

ment and in full satisfaction of all claims stemming from the rejection of its applications for phosphate leases in the Osceola National Forest.

52. It is agreed that the sum of nine million five hundred thousand dollars ($9,500,000) should be appropriated and awarded to Global in settlement and in full satisfaction of all claims stemming from the rejection of its applications for phosphate leases in the Osceola National Forest.

53. It is agreed that there is no issue of delay, laches, statute of limitations, or failure to resort to any established legal remedy, as to Kerr–McGee's or Global's claims.

54. Kerr–McGee and the United States accordingly ask that the hearing officer report to Congress that Kerr–McGee's demand is an equitable claim and not a gratuity and that the amount equitably due from the United States to Kerr–McGee is Ten Million Dollars ($10,000,000).

55. Global and the United States accordingly ask that the hearing officer report to Congress that Global's demand is an equitable claim and not a gratuity and that the amount equitably due from the United States to Global is Nine Million Five Hundred Thousand Dollars ($9,500,000).

56. Plaintiffs Kerr–McGee and Global and defendant United States recommend that the court, as hearing officer in this matter, issue a report adopting the findings of fact and conclusions of law recited herein.

57. Nothing in these proposed findings of fact, conclusions of law, and recommendation regarding entry of the report concerning the claims of plaintiffs Kerr–McGee and Global shall inure to the benefit of any party not a signatory to this document.